**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Michael S. GARDNER,
Defendant-Appellant.**

No. 74–1311.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 18, 1974.

Decided April 4, 1975.

Rehearing and Rehearing En Banc
Denied May 27, 1975.

Certiorari Denied Oct. 6, 1975.
See 96 S.Ct. 118.

Morton Berger, White Plains, N. Y., for defendant-appellant.

James R. Thompson, U. S. Atty., Gary L. Starkman and Ann C. Tighe, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before CASTLE, Senior Circuit Judge, SWYGERT, Circuit Judge, and WYZANSKI, Senior District Judge *.

CASTLE, Senior Circuit Judge.

The defendant Michael S. Gardner was convicted by a jury of wilfully and knowingly receiving, concealing and storing ten $100,000 United States Treasury bills in violation of 18 U.S.C. § 2315.[1] On appeal, Gardner urges reversal because: (1) the Government interfered with the grand jury process; (2) he was not given *Miranda* warnings prior to his arrest; (3) his in-custodial statements were not voluntary; (4) the Government failed to prove beyond a reasonable doubt that he was not entrapped; (5) the Government failed to prove beyond a reasonable doubt that the securities constituted interstate commerce; (6) the trial court erred in its instructions to the jury; and (7) prejudicial testimony was admitted. We affirm his conviction.

## I.

The ten Treasury bills were stolen by an unknown person in New York on January 10, 1972. Louis Netzel, an FBI "cooperating individual," contacted the FBI in Chicago with the information that he had met with the defendant in New York, and at that meeting the defendant had sought his aid in disposing of stolen securities. Netzel provided the FBI with a list which he subsequently received from Gardner containing the serial numbers of stolen securities, and these numbers matched the serial numbers of the Treasury bills stolen in New York on January 10.

Subsequently, Gardner called Netzel from Florida and asked Netzel to meet him in either Miami or Panama in order to negotiate the stolen Treasury bills. Pursuant to a plan developed by the FBI, Netzel called Gardner back, and told him that because the Treasury bills were past due, it would be necessary for Gardner to come to a bank in Chicago and prepare a fraudulent Certificate of Ownership, thereby making the securities disposable even though overdue. Netzel informed Gardner that he knew a Chicago banker who had connections with an attorney who would be able to prepare the false Certificate.

Netzel met Gardner at Chicago's O'Hare Airport on October 18, 1972, and they proceeded to a coffee shop in a motel located near O'Hare. While they were in the coffee shop, Gardner recognized a man outside, left the shop and Netzel's view, and then returned to the waiting Netzel, stating that he had the securities. Netzel and Gardner then departed for a downtown Chicago bank, and at some time prior to reaching their destination, Gardner gave Netzel a sealed envelope containing the stolen securities.

They arrived at the bank at approximately 11:00 a.m. According to the FBI's prearranged plan, Netzel entered room 1305 in the bank while Gardner waited in the reception area. In that room, Netzel met with FBI agent Riggs, who had assumed the undercover role of a bank vice-president. He also met with FBI agent Zimms who had assumed the undercover identity of the attorney who

* Senior District Judge Charles Edward Wyzanski, Jr., of the District of Massachusetts, is sitting by designation.

1. That section provides in part:

Whoever receives, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more, or pledges or accepts as security for a loan any goods, wares, or merchandise, or securities, of the value of $500 or more, moving as, or which are a part of, or which constitute interstate or foreign commerce, knowing the same to have been stolen, unlawfully converted, or taken; or

\* \* \* \* \* \*

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

\* \* \* \* \* \*

was to fraudulently prepare the Certificate of Ownership necessary for negotiation. Netzel gave the envelope containing the securities to agent Riggs and told him that he had received the envelope from Gardner.

Netzel and Riggs left the office and Netzel introduced Riggs to Gardner as bank vice-president Randolph. They then returned to room 1305 where Zimms was introduced as attorney Pasquale. In the office, Riggs explained to Gardner the procedure that was to be used to negotiate the Treasury bills. After Netzel and Riggs had left the room, agent Zimms began to complete the Certificate of Ownership, and stated that he needed to know where the Treasury bills were stolen. Gardner replied that they were stolen in New York.

There was a knock at the door, and in response Gardner placed the envelope containing the Treasury bills in the inside pocket of his suitcoat and then opened the door. FBI agent Birge, who was at the partially opened door, asked Gardner if he was the bank vice-president. Gardner said no, turned his back to the door, took the envelope containing the Treasury bills from his pocket, dropped it to the floor, and kicked it under a lamp table. Agent Birge and two other agents then entered the room, and after identifying himself, Birge stated that he had information that stolen securities were in the room. Gardner stated that he had no knowledge of any stolen Treasury bills. At approximately 11:20 a. m., the agents arrested Gardner and agent Zimms.

Immediately after arresting Gardner, agent Birge orally gave Gardner his *Miranda* warnings and handed Gardner a waiver of rights form. Gardner read the form, but declined to sign it. He stated, however, that he understood his rights. Although informed of his right to the presence of an attorney, the evidence was conflicting as to whether Gardner requested one at that time.

The defendant was then taken to the offices of the FBI where he arrived at 11:45 a.m. Upon entering an FBI inter-view room, agent Birge again advised Gardner of his constitutional rights and repeated his request that Gardner sign a waiver of rights form. Gardner stated that he understood his rights, but refused to sign the form. Again, the evidence was disputed as to whether Gardner requested an attorney. The defendant was then urged to make a statement, but he responded that he was not certain what he wanted to do. Gardner thought about the matter uninterruptedly for about ten minutes, and at the end of that interval announced that he wanted to make a statement and wished to cooperate fully. After once more responding that he understood his rights, and after repeating his refusal to sign the waiver of rights form, Gardner gave a statement of his participation in the crime charged. He was brought before a magistrate and arraigned at approximately 4:00 p.m.

## II.

Gardner's first attack is that the indictment returned by the grand jury should be dismissed because the Government interfered with the grand jury process. Gardner initially appeared before the grand jury and refused to testify, claiming his fifth amendment privilege against self-incrimination. Subsequently, an immunity order was entered. After the grant of immunity was obtained, circumstances led the Government to believe that Gardner would abuse the order of immunity by lying before the grand jury. The Government therefore declined to call Gardner to testify.

The grand jury is "accorded wide latitude to inquire into violations of criminal law," and it "may compel the production of evidence or the testimony of witnesses as it considers appropriate . . . ." United States v. Calandra, 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974). Its inquiry, however, determines only whether there is probable cause to believe that a crime has been committed. *Id.* Thus, the Government on its own need not produce

evidence that undermines the credibility of its witnesses, Jack v. United States, 409 F.2d 522, 524 (9th Cir. 1969), United States v. Addonizio, 313 F.Supp. 486, 495 (D.N.J.1970), aff'd 451 F.2d 49 (3d Cir.), cert. denied 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972), and the defendant has no absolute right to appear before the grand jury. United States ex rel. McCann v. Thompson, 144 F.2d 604, 605–606 (2d Cir.), cert. denied 323 U.S. 790, 65 S.Ct. 313, 89 L.Ed. 630 (1944); United States v. Kernodle, 367 F.Supp. 844, 854 (M.D.N.C.1973). Recognizing this, Gardner nevertheless claims that the Government interfered because it was the grand jury itself that requested him to testify, and therefore by failing to call him, the Government compromised the grand jury's function of "standing between the accuser and the accused," Wood v. Georgia, 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569 (1962), and frustrated its inquiry.

Contrary to Gardner's claim, the record does not show that it was the grand jury that wanted him to testify. There is no indication as to who initially called Gardner before the grand jury, but the defendant does not argue that it was that body. Further, a review of the record and of the immunity order itself shows that the order was entered upon the Government's request. There is no evidence to suggest that the order represented a desire on the part of the grand jury itself that Gardner testify before it, and the Government did not call Gardner only because of its subsequent belief that Gardner would lie. Accordingly, we cannot find any interference with the grand jury process.

### III.

Gardner contends that the court erred by admitting into evidence admissions, both verbal and those implicit in his actions, made at the bank prior to his arrest and before the *Miranda* warnings were given. He argues that because at the time he made these admissions the focus of the investigation was on him and the agents had probable cause to arrest him, he should have received the *Miranda* warnings, and in their absence, any admissions he made were not admissible.

■ Gardner, however, overlooks the reason for the *Miranda* rules. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Miranda* was designed to effectuate the right against compulsory self-incrimination by guarding against the inherent pressures to speak present in the face of governmental authority. Where there is no governmental authority present, there can be no compulsion which the *Miranda* rules were structured to shield against. Thus, the Court in Hoffa v. United States, 385 U.S. 293, 304, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), after noting that "a necessary element of compulsory self-incrimination is some kind of compulsion," rejected the defendant's claim that incriminating admissions made to a government informer violated the defendant's fifth amendment privilege. And in United States v. Dickerson, 413 F.2d 1111, 1114 (7th Cir. 1969), we stated: "We understand the teaching of *Miranda* to be that one *confronted with governmental authority* in an adversary situation should be accorded the opportunity to make an intelligent decision as to the assertion or relinquishment of those rights . . . .." (Emphasis added.) *Cf.* United States v. Lemonakis, 158 U.S.App.D.C. 162, 485 F.2d 941, 954 n. 20 (1973), cert. denied 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974); United States v. Montos, 421 F.2d 215, 222 (5th Cir.), cert. denied 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532 (1970).

■ Here, the agents at the bank assumed undercover identities. Gardner was therefore not confronted with governmental authority of which he was aware, and consequently there could be no inherent compulsion. Thus, in the absence of governmental authority which could give rise to inherently compelling pressures, the *Miranda* rules are not engaged. Although whether the investigation has focused on the accused helps to ascertain the effect of a governmental

authority's presence, inquiry into that element is not relevant where, as is the case here, there is no such confrontation. Similarly, in light of the reason for the *Miranda* rules, where there is no confrontation with governmental authority, the existence of probable cause is irrelevant to when *Miranda* attaches. The Government, of course, is under no duty to cease its investigation when probable cause is reached. Hoffa v. United States, *supra*, 385 U.S. at 309–310, 87 S.Ct. 408; *see also* United States v. Skelley, 501 F.2d 447, 550 (7th Cir.), cert. denied 419 U.S. 1051, 95 S.Ct. 629, 42 L.Ed.2d 647 (1974). Accordingly, the trial court properly admitted Gardner's prearrest admissions.

## IV.

Gardner next challenges the trial court's denial of his motion to suppress the in-custodial statement he made in the FBI office. The basis of his challenge is that the Government failed to prove by the preponderance of the evidence that his statement resulted from a knowing and intelligent waiver of his right to remain silent, and that absent such a knowing waiver his statement must be considered involuntary and excluded.

 Preliminarily, however, Gardner argues that the trial court's ruling on the issue of the voluntariness of his in-custodial statement was inadequate. At the close of the suppression hearing, the district court stated: "The motion to suppress is overruled." Although the court need not make formal findings of fact or write an opinion, its conclusion that the confession is voluntary must appear from the record with unmistakable clarity. Sims v. Georgia, 385 U.S. 538, 544, 87 S.Ct. 639, 17 L.Ed.2d 593 (1967); United States v. Cox, 487 F.2d 634, 636 (5th Cir. 1973). It is Gardner's position

that it is impossible to tell from "The motion to suppress is overruled," whether the court was aware that under *Miranda* a finding of a knowing waiver is a prerequisite to concluding that the statement is voluntary. He states that in such circumstances, Sims v. Georgia, *supra*, and United States v. Goss, 484 F.2d 434 (6th Cir. 1973) require that the case be remanded to the district court for a review of the evidence brought out at the hearing and an explicit statement by the court as to its finding on the voluntariness issue.

However, we are not limited to looking only at the district court's one sentence conclusion, and in contrast to the situation in *Sims,* we think the record clearly discloses that the court was aware of the *Miranda* requirement and that the court's ruling was the result of its application. Prior to the trial court's ruling, defense counsel specifically argued that Gardner's rights under the *Miranda* decision were violated. Government counsel reviewed for the court the requirements of *Miranda,* and explained why, in his view, those requirements had been fulfilled. It was after these arguments which put the issue of whether Gardner knowingly waived his right to remain silent squarely before the court that the court denied the motion to suppress. Further, unlike the counsel in Sims v. Georgia, *supra* 385 U.S. at 541, 87 S.Ct. 639, counsel here did not complain that he did not understand the meaning of the court's ruling, and it would not have been difficult to speak up if he did not.

United States v. Goss, *supra,* in which the court held that a ruling similar to the one here was insufficient, is no barrier to the result we reach because that decision does not indicate to what extent the district court was aware of the various requirements necessary to determining voluntariness.[2] There is no question

2. We also note that the decision seems to suggest that it was the fact that "the voluntariness of Goss' confession [must] appear from [the] evidence 'with unmistakable clarity'" 484 F.2d at 437, that made the trial court's ruling of "The motion is overruled" inadequate. However, it is only the *conclusion* that the statement is voluntary that must appear "with unmistakable clarity," and Lego v. Twomey, 404 U.S. 477, 489, 92 S.Ct. 619, 30

that the suppression hearing concerned the voluntariness of the defendant's statements, and consequently, we feel the present situation to be similar to that in United States v. Chapman, 448 F.2d 1381, 1387 (3d Cir. 1971), cert. denied Overton v. United States, 405 U.S. 929, 92 S.Ct. 982, 30 L.Ed.2d 803 (1972), where the court, after noting that the record disclosed, as it does here, that counsel for both parties argued the voluntariness issue, stated:

> A review of the record, including these statements [of counsel], makes it clear to us that the judge was cognizant of the fact that he was ruling on the *Miranda* requirements, and that he applied the correct standards. (Footnote omitted.)

Although it would have been the better practice for the court to state that it found the statements to be voluntary by the preponderance of the evidence and to give its reasons for so concluding, *see* United States v. Chapman, *supra,* at 1387 n. 8, we find that the court considered the appropriate *Miranda* requirements, and in light of the record, the court's ruling was not inadequate. We turn, then, to the contention that the court erred by denying the motion to suppress.

Gardner points to three factors, brought out at the suppression hearing and at trial, which he claims demonstrates that he did not waive his right to remain silent and that therefore his statement was involuntary. First, Gardner relies on the fact that he refused to sign the waiver of rights form.

▮ There was no attorney present at the time Gardner gave his statement, and we recognize that if questioning commences without the presence of an attorney and a statement is taken, a heavy burden rests on the Government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination. Miranda v. Arizona, *supra,* 384 U.S. at 475, 86 S.Ct. 1602. A refusal to sign a waiver form is a relevant factor in determining whether the defendant knowingly and intelligently waived his privilege, but it is not a controlling one. United States v. Crisp, 435 F.2d 354, 358 (7th Cir. 1970), cert. denied 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 116 (1971); *accord,* United States v. Ingram, 477 F.2d 236, 240 (7th Cir.), cert. denied 414 U.S. 840, 94 S.Ct. 94, 38 L.Ed.2d 76 (1973); United States v. McDaniel, 463 F.2d 129 (5th Cir. 1972), cert. denied 413 U.S. 919, 93 S.Ct. 3046, 37 L.Ed.2d 1041 (1973); United States v. Ellis, 457 F.2d 1204 (8th Cir. 1972). As the court noted in *McDaniel, supra,* at 135:

> A refusal to sign a waiver may indicate nothing more than a reluctance to put pen to paper under the circumstance of custody. A detainee may still wish to discuss the matter with his detainers for any number of reasons, including a desire to exculpate or explain himself. Put another way, a detainee may make statements that are quite voluntary without signing a written waiver. A court must look to all the circumstances of the detention to ascertain whether or not the refusal to sign a waiver was tantamount to a refusal to discuss.

*See also* United States v. Cooper, 163 U.S.App.D.C. 55, 499 F.2d 1060, 1062 (1974). Thus, declining to sign the waiver form is only one factor among others to be considered in determining the voluntariness of the statements.

Nevertheless, the defendant seeks solace in United States v. Nielsen, 392 F.2d 849 (7th Cir. 1968), and United States v. Jenkins, 440 F.2d 574 (7th Cir. 1971), contending that they are controlling here. Both *Nielsen* and *Jenkins* excluded statements made after the defendants refused to sign a waiver of rights form. Contrary to the defendant's contentions, both *Nielsen* and *Jenkins* are distinguishable.

---

L.Ed.2d 618 (1972) requires only that voluntariness be proved by a preponderance of the

evidence. *See also* United States v. Cox, *supra,* at 636.

First, those decisions do not indicate that the defendant responded that he understood his rights after they were read to him. Here, however, it is undisputed that Gardner in several instances stated to the agents that he understood his rights.

Second, after indicating that he was uncertain as to whether he wished to make a statement, Gardner thought about the problem for about ten minutes and then stated that he wished to cooperate. Thus, unlike *Jenkins,* Gardner was not questioned immediately after refusing to sign the waiver form, and unlike *Nielsen,* Gardner was given uninterrupted time to contemplate and assess a difficult situation. It is clear that during the ten minute interval Gardner was weighing the alternatives and then decided to cooperate, thereby voluntarily initiating the questioning which brought forth the incriminating statements. We do not think the circumstances show an "equivocal invitation" to question, *Nielsen, supra,* at 853, but instead, an intelligent decision to cooperate. In view of the natural reluctance to put pen to paper, the failure to sign the form does not indicate that Gardner's statements in this situation were not voluntary.

Gardner suggests, however, that two additional factors give significance to his refusal to sign the waiver form and demonstrate that his statements were involuntary. He argues first that he requested an attorney, and that this request indicated a desire to remain silent in the attorney's absence. Although at the suppression hearing he testified that while in the FBI office he requested an attorney six times, two agents who were present with him testified that he did not request an attorney. At trial, there was also conflicting evidence, not before the court at the suppression hearing, as to whether Gardner requested an attorney at the time of his arrest.

Gardner next points to the approximately four hour delay between arrest and arraignment and contends that this militates against the conclusion that he voluntarily waived his rights. He attributes significance to the fact that it took the agents approximately 2½ hours to obtain a ten to twenty minute statement from him, asserting that this demonstrates a reluctance to talk. There was evidence, however, that during the questioning there was a break for coffee, that the agents procured pipe tobacco and other things for the defendant, and that when Gardner finished giving his statement, there was a break of ten or fifteen minutes in duration. Gardner himself testified that the whole first hour of the session was relaxed.

Despite Gardner's arguments, the district judge had ample opportunity to scrutinize both Gardner and the agents at the suppression hearing, and resolved the conflicting testimony against Gardner. It is not our function to substitute our judgment for that of the district court, and where, as is the case here, the finding is substantially supported by the evidence, we will not overturn it. United States v. Springer, 460 F.2d 1344, 1348 (7th Cir.), cert. denied 409 U.S. 873, 93 S.Ct. 205, 34 L.Ed.2d 125 (1972); United States v. McNeil, 140 U.S.App. D.C. 3, 433 F.2d 1109 (1969). As to the additional evidence brought out at trial, Gardner did not ask the court to reconsider its denial of his motion to suppress in light of it, and there was no error in permitting the jury to consider that evidence in resolving the voluntary character of Gardner's statement. The district court correctly denied defendant's motion to suppress, and properly submitted the issue of the voluntariness of the defendant's statement to the jury.

## V.

Gardner argues that the Government failed to prove beyond a reasonable doubt that he had not been entrapped. His first attack is directed at the employment by the Government of informant Leo Netzel. Netzel was reimbursed for the expenses he had incurred

and also was paid a fee for his services in connection with the recovery of the stolen Treasury bills. The money was paid after the stolen securities were recovered, and Netzel testified that reimbursement of his expenses and payment of his fee were contingent on their recovery. Relying on Williamson v. United States, 311 F.2d 441 (5th Cir. 1962), Gardner argues that disclosure of this type of arrangement requires reversal of his conviction.

In *Williamson,* the informer was offered a specific sum of money contingent on "catching" certain specified individuals. Exercising its supervisory power over the administration of criminal justice in the federal courts, the court reversed the defendants' convictions. The court stated that "we cannot sanction a contingent fee agreement to produce evidence against particular named defendants as to crimes not yet committed," and concluded that such an arrangement, "standing alone and unexplained, discloses a form of employment of an informer which this Court cannot approve or sanction." *Id.* at 444.

We need not express a view as to the propriety of the type of arrangement in *Williamson,* because that case clearly has no application here.[3] Netzel was not directed to produce evidence or to "make a case" against a specified individual. Rather, viewing the evidence in the light most favorable to the Government, Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the evidence is clear that Gardner first approached Netzel about disposing of stolen securities, and that Netzel subsequently informed the FBI of Gardner's offer. Thus, unlike *Williamson,* there was no pre-existing arrangement unsupported by evidence which directed Netzel to Gardner, and while the fee was contingent on the recovery of the securities, it was not contingent upon recovery from a particular person. Accordingly, we think that the arrangement here is within the limits of permissible governmental conduct. *See* United States v. Cuomo, 479 F.2d 688, 691–692 (2d Cir.), cert. denied, Rizzo v. United States, 414 U.S. 1002, 94 S.Ct. 357, 38 L.Ed.2d 238 (1973).

Further, *Williamson* does not suggest that the testimony of a government informer who is paid a fee is so unreliable as to require corroboration in all instances in order to sustain the Government's burden that the defendant was not entrapped. In the unique circumstances of the *Williamson* case, the court concluded that because of the type of agreement that was disclosed, some type of justification or explanation was required, and in its absence, it could not sanction such an arrangement. As discussed above, the arrangement here is not of the character disclosed in *Williamson,* and thus we think that the mode of payment was properly a matter for the

---

**3.** The court in United States v. Grimes, 438 F.2d 391, 395 (6th Cir.), cert. denied 402 U.S. 989, 91 S.Ct. 1684, 29 L.Ed.2d 155 (1971) refused to follow *Williamson,* holding that even if all the factors in *Williamson* were present, the arrangement for paying informers goes only to the weight and credibility of their testimony and does not otherwise invalidate it.

Further, although under United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), the focus on entrapment is on the defendant's predisposition to commit the crime, *see also* United States v. Quintana, 508 F.2d 867, 876–877 (7th Cir. 1975), the Court did state that there may be a situation in which the conduct of law enforcement officials is so outrageous that due process principles would bar the government from using the judicial processes to obtain a conviction. *Id.* 411 U.S. at 431, 93 S.Ct. 1637. But the Court also seemed to suggest that unless that due process level is reached, the Judicial Branch should refrain from dismissing prosecutions "for what it feels to have been 'overzealous law enforcement' . . ..", *id.* at 435, 93 S.Ct. at 1644, thus casting doubt on the use of the supervisory power in this area. Assuming that the *Williamson* court would also find that the arrangement there violated due process, our conclusion is not only that due process is not violated by the arrangement here, but also that we do not have to consider whether we could apply our supervisory powers since the facts in *Williamson* which brought forth the exercise of that power are not present in this case.

jury to consider in weighing the credibility of the informant.[4] United States v. Baxter, 342 F.2d 773, 774 (6th Cir.), cert. denied 381 U.S. 934, 85 S.Ct. 1766, 14 L.Ed.2d 699 (1965).

Finally, under United States v. Russell, *supra* note 3, we have no doubt that there was substantial evidence to support the jury's finding beyond a reasonable doubt that the defendant was predisposed to commit the crime charged and consequently was not entrapped.

## VI.

18 U.S.C. § 2315 requires that the stolen securities which Gardner received, concealed and stored were moving as or constituted interstate commerce. Gardner contends that the Government failed to prove beyond a reasonable doubt this element of the offense. Alternatively, Gardner asserts that the Government introduced the element of interstate commerce solely for the purpose of obtaining jurisdiction, and that therefore he was entrapped into committing a federal offense.

The evidence disclosed that the securities were stolen in New York on January 10, 1972. In telephone conversations with Gardner shortly before October 18, 1972, Gardner told Netzel that he had the securities with him in Florida, and that Netzel should meet him in Miami or Panama to negotiate their sale. Although the evidence does not indicate that Gardner had the securities on his person when he arrived at O'Hare, it is undisputed that Gardner possessed the stolen securities when he arrived at the bank.

 The sole purpose for meeting Netzel in Chicago was to arrange for the disposition of the securities, and the securities were transported to Chicago in furtherance of that goal. It is not important whether Gardner himself transported the securities so long as they constituted interstate commerce at the time of the commission of the offense, and whether they did is a determination for the jury. *See* United States v. Rabin, 316 F.2d 564 (7th Cir.), cert. denied 375 U.S. 815, 84 S.Ct. 48, 11 L.Ed.2d 50 (1963); Lee v. United States, 363 F.2d 469 (8th Cir.), cert. denied 385 U.S. 947, 87 S.Ct. 323, 17 L.Ed.2d 227 (1966). From the facts presented, we think the evidence ample from which the jury could infer beyond a reasonable doubt that the securities constituted interstate commerce at the time of their receipt by Gardner.

Gardner's alternate contention fares no better. In United States v. Edwards, 366 F.2d 853, 867–868 (2d Cir. 1966), cert. denied Jakob v. United States, 386 U.S. 908, 87 S.Ct. 852, 17 L.Ed.2d 782 (1967), the court rejected a similar argument that the Government had injected the interstate element of the offense:

> In the present case, the government did no more than afford the opportunity and facilities for the commission of the offense charged; the participants were awaiting "any propitious opportunity," [citations omitted] and never considered themselves limited by . . . boundaries.

 The evidence here shows that Gardner actively sought an outlet for the disposition of stolen securities. He did not consider himself limited by any particular boundaries, but desired to dispose of the Treasury bills wherever the opportunity arose. The Government merely afforded the opportunity, and the defendant chose to seize it. Stealth and strategy are permissible tactics, and in the absence of any "shocking" government involvement in the criminal activity, Gardner's predisposition is fatal to any claim of entrapment. United States

4. The court instructed the jury to weigh Netzel's testimony with care:

 The testimony of an informer who provides evidence against the defendant for pay or for immunity from punishment or for personal advantage or vindication must be examined and weighed by you with greater care than the ordinary witness. You must determine whether the informer's testimony has been affected by his interest or his prejudice against the defendant.

v. Russell, *supra* note 3, 411 U.S. at 433, 436, 93 S.Ct. 1637.

Consequently, Gardner's reliance on United States v. Archer, 486 F.2d 670 (2d Cir. 1973) is misplaced. There the court reversed the convictions of two defendants for using telephone facilities in interstate and foreign commerce to commit bribery. The court, in the circumstances of that case, found the evidence insufficient to establish the use of a facility in interstate or foreign commerce because the evidence that did exist to support the federal element necessary for jurisdiction was "furnished solely by undercover agents . . .." 486 F.2d at 686. The essence of that holding is that the defendants were not merely taking advantage of an opportunity to complete their scheme provided by the Government, and that they were not predisposed to make the telephone calls.[5] As indicated above, that is not the situation here, and thus there is no basis for reversal.

## VII.

Gardner points to errors in the trial court's jury instructions.

### A.

Gardner argues that the trial court's charge to the jury on the issue of the voluntariness of his extrajudicial statements was erroneous. The court instructed the jury:

> Evidence has been introduced that the defendant confessed that he committed the crime charged in the indictment. You should carefully scrutinize all the circumstances surrounding the confession and determine whether it was made freely and voluntarily. If

you find that the confession was made by the defendant freely and voluntarily, with an understanding of the nature of his confession, and without fear or coercion, either physical or psychological or without promises of reward, you should consider the confession together with all of the other evidence in the case in determining the guilt or the innocence of the defendant. However, if you find that the confession was not freely and voluntarily made, you may, under those circumstances, disregard it entirely.

Now, in every criminal case the government must first establish the fact that a crime has been committed. This is known in law as the corpus delicti, and it must be proven independently of any alleged confession by the defendant. However, it is not necessary that such independent evidence establish the corpus delicti beyond a reasonable doubt. The law does not require that a defendant be brought before a Magistrate immediately after arrest, however, a defendant may not be delayed unnecessarily. A period of delay less than six hours in duration is not an unnecessary delay solely because of that period of time.

First, Gardner contends that the characterization of his statements made in the bank and in the FBI office as a "confession" was prejudicial because use of that word implies a characterization which the jury might consider as the court's conclusion from a review of those statements as to the guilt or innocence of the defendant. The statements, however, were clearly incriminating in nature. Thus, we are not faced with a characterization of statements as a "confession" that could be termed equivocal

5. The first telephone call which the court found insufficient to supply the necessary federal element was one defendant's return call from New York to the undercover agent in Newark, N.J. The call was insufficient because the initial call was made "for the sole purpose of having [the defendant] talk in an interstate telephone call." 486 F.2d at 674. The attempts by one of the defendants in New York to call the undercover agent in Las Vegas, apart from the fact that they were unsuccessful, were insufficient because "[t]hose calls also resulted from a plant by the Government . . . which provoked interstate telephone calls that . . . would not otherwise have [been] made." 486 F.2d at 682. The final call was the *receipt* of a call by one of the defendants from the undercover agent in Paris, and was characterized as an "incidental occurrence." 486 F.2d at 682.

or exculpatory in nature.[6] *Cf.* United States v. Grunberger, 431 F.2d 1062, 1069 (2d Cir. 1970). Further, the court instructed the jury that they were the sole and exclusive judges of the facts. In these circumstances, we do not think that the jury was encouraged to draw any improper inferences by the court's use of the term "confession." Nevertheless, we do believe that the word "statements" is a more neutral description than "confession," and should be used in its place in future instructions unless the statements can be considered a "complete and conscious admission of guilt—a strict confession." *See* Opper v. United States, 348 U.S. 84, 91 & n. 7, 75 S.Ct. 158, 163, 99 L.Ed. 101 (1954).

[19] Second, Gardner claims that the court erred because instead of instructing the jury that they "should" disregard the confession if found involuntary, the court charged the jury that they "may" disregard the confession. However, as the defendant conceded at oral argument, the reading of "may" by the court was a slip of the tongue, the court inadvertently substituting "may" for "should" in the standard LaBuy instruction. W. LaBuy, Jury Instructions in Federal Criminal Cases § 6.12 (1965). Although the defendant initially objected to the instruction as a whole, there was no subsequent objection which would have brought the matter to the attention of the court. In United States v. Van Drunen, 501 F.2d 1393, 1395 (7th Cir.), cert. denied 419 U.S. 1091, 95 S.Ct. 684, 42 L.Ed.2d 684 (1974), we stated: "The policy reasons for requiring trial errors to be brought to the attention of the trial judge are never stronger than when the error is a completely unintentional slip of the tongue." The misstatement by the trial court would have been easily curable and there is no plain error. Thus, the present complaint is too late. Fed.R.Crim.P. 30.

 Third, the defendant asserts that the charge was improper because it precluded the jury from considering the ef-

fect of the delay on the issue of the voluntariness of the defendant's statements. We do not read the instruction as having such an effect, but instead find that it merely informs the jury that the length of delay in this case by itself is not sufficient to render the defendant's statements involuntary. The jury was clearly free to consider the length of delay in conjunction with other factors. The court's charge was a correct statement of the law and there was no error. 18 U.S.C. § 3501(c); United States v. Marrero, 450 F.2d 373, 378 (2d Cir. 1971), cert. denied 405 U.S. 933, 92 S.Ct. 991, 30 L.Ed.2d 808 (1972).

 Gardner's last attack on this portion of the trial court's instructions is directed at the failure of the trial court to advise the jury that the requirements of *Miranda* must be satisfied. However, the court plainly informed the jury that in determining the voluntariness of defendant's confession they should carefully scrutinize all the circumstances surrounding the confession, and that they should consider whether the defendant understood the nature of the confession and whether it was given without fear of physical or psychological coercion. There is no requirement that the jury be instructed on the elements of *Miranda*, and the trial court's charge was sufficient to set forth for the jury's consideration the factors relevant to its voluntariness determination. United States v. Adams, 484 F.2d 357, 362 (7th Cir. 1973); United States v. Thomas, 475 F.2d 115, 117 (10th Cir. 1973). Accordingly, the trial court's instructions were not prejudicial.

## B.

Gardner also claims that the court's instruction on entrapment was erroneous. In accordance with the standard LaBuy instruction, W. LaBuy, *supra*, at § 5.02, the court charged the jury:

Now, the defendant has interposed the defense of entrapment. To constitute a defense the entrapment must be un-

6. The court gave a separate instruction concerning exculpatory statements.

lawful. Unlawful entrapment means that the idea of committing the crime originated with the law enforcement officers or their agents rather than with the defendant; that the defendant had no previous disposition to violate the law and they urged and induced him to commit the crime charged. This defense is based on the policy of the law not to ensnare or entrap an innocent person into the commission of a crime, and the burden is on the government to prove beyond a reasonable doubt that the defendant was not entrapped.

Now, the defense of unlawful entrapment is not established if the defendant was either engaged in similar crimes or was ready and willing to violate the law and the law enforcement officers or their agents merely afforded him the opportunity of committing the crime. Under these circumstances entrapment is lawful rather than unlawful, even though the law officers may have had to use a ruse or otherwise conceal their identity.

The defendant's first argument is that use of the words "lawful" and "unlawful" to describe entrapment is improper and confusing and that this amounts to reversible error. Gardner objected to the instruction that was given, and his proposed instruction in which those terms were eliminated was refused.

We are considering the propriety of this LaBuy instruction for the first time. The Second, Third, Fifth and Tenth Circuits[7] have disapproved the description of entrapment as "lawful" or "unlawful," and the Eighth Circuit has adopted an instruction which does not employ those terms.[8] The Ninth Circuit has indicated approval of these terms, but has only held that their use, in the absence of an objection, does not amount to plain error.[9] Only the Sixth Circuit has actually found use of those modifiers to be satisfactory.[10]

Of the decisions, only the Tenth Circuit, in United States v. Hayes, 441 F.2d 542 (10th Cir. 1971) and United States v. Hill, 444 F.2d 115 (10th Cir. 1971) has found that the description of entrapment as "lawful" or "unlawful" amounted to plain error. However, we agree with the analysis in Virgin Islands v. Cruz, supra note 7, at 718–719 that the court reached that result not because their use was extremely prejudicial but because of the failure of the district courts to heed the earlier decisions of the Circuit disapproving use of those terms. In the remaining cases, although concluding that the terms "lawful" and "unlawful" should not be employed, the courts, in the absence of objection, have refused to conclude that their use was so prejudicial as to find plain error. Unlike those cases, however, we are here faced with a timely objection, and we must thus consider whether the use of those terms, if improper, was harmless.

■ We agree that entrapment is the description of the unlawful act. The defendant is either entrapped or not entrapped, a conclusion reached after consideration of the elements composing the entrapment test. Therefore, there is no "lawful" entrapment, and "unlawful" entrapment is redundant. Consequently, the terms "lawful" and "unlawful" should not be employed, and the district courts should in the future be guided by the instruction on entrapment found in

---

7. United States v. Pugliese, 346 F.2d 861, 864 (2d Cir. 1965); Virgin Islands v. Cruz, 478 F.2d 712 (3d Cir. 1973); United States v. Sadler, 488 F.2d 434 (5th Cir.), cert. denied 417 U.S. 931, 94 S.Ct. 2642, 41 L.Ed.2d 234 (1974); Garcia v. United States, 373 F.3d 806 (10th Cir. 1967); Martinez v. United States, 373 F.2d 810 (10th Cir. 1967).

8. United States v. Pollard, 483 F.2d 929 (8th Cir. 1973), cert. denied 414 U.S. 1137, 94 S.Ct. 882, 38 L.Ed.2d 762 (1974); United States v. Dawson, 467 F.2d 668, 674 (8th Cir. 1972), cert. denied 410 U.S. 956, 93 S.Ct. 1427, 35 L.Ed.2d 689 (1973).

9. United States v. Tatar, 439 F.2d 1300, 1303 (9th Cir.), cert. denied 404 U.S. 866, 92 S.Ct. 69, 30 L.Ed.2d 109 (1971).

10. United States v. Ambrose, 483 F.2d 742, 753 (6th Cir. 1973).

E. Devitt & C. Blackmar, Federal Jury Practice and Instructions § 13.13 (2d ed. Supp.1974), at 179–180.[11]

■ Our semantical chores aside, we note that the trial court's instructions defined "lawful" and "unlawful" entrapment. These definitions correctly expressed to the jury the elements they should consider to decide whether the defendant was, or was not, entrapped. In light of their definitions, we do not think that the use of "lawful" or "unlawful" to describe entrapment misled the jury, and thus we are convinced that their employment was harmless. Fed.R. Crim.P. 52(a); United States v. Panczko, 429 F.2d 683, 686 (7th Cir.), cert. denied 400 U.S. 946, 91 S.Ct. 253, 27 L.Ed.2d 252 (1970).

■ Next, the defendant contends, relying on Notaro v. United States, 363 F.2d 169 (9th Cir. 1966), that the entrapment instruction was erroneous because the burden of proof was stated ambigu-

ously and could be read to place the burden on the defendant. Unlike the instruction in *Notaro*,[12] however, the trial court's charge here stated that the burden is *on the Government* to prove beyond a reasonable doubt that the defendant was not entrapped. In view of this explicit statement, we do not think that the immediately following sentence employing the word "established" can be interpreted to place any burden on the defendant. Further, the jury was also generally instructed that the burden of proof that is on the Government never shifts throughout the trial, and that the law does not require the defendant to produce any evidence. Accordingly, we find that the jury was not misled and that the burden was properly placed.

■ Finally, the defendant challenges the instructions because they failed to advise the jury that the defendant must be acquitted if the Government failed to prove beyond a reasonable

11. That instruction provides:

The defendant asserts that he was a victim of entrapment as to the offense charged in the indictment.

Where a person has no previous intent or purpose to violate the law, but is induced or persuaded by law enforcement officers or their agents to commit a crime, he is a victim of entrapment, and the law as a matter of policy forbids his conviction in such a case.

On the other hand, where a person already has the readiness and willingness to break the law, the mere fact that government agents provide what appears to be a favorable opportunity is not entrapment. For example, when the government suspects that a person is engaged in the illicit sale of narcotics, it is not entrapment for a government agent to pretend to be someone else and to offer, either directly or through an informer or other decoy, to purchase narcotics from the suspected person.

If, then, the jury should find beyond a reasonable doubt from the evidence in the case that, before anything at all occurred respecting the alleged offense involved in this case, the defendant was ready and willing to commit crimes such as are charged in the indictment, whenever opportunity was afforded, and that government officers or their agents did no more than offer the opportunity, then the jury should find that the defendant is not a victim of entrapment.

On the other hand, if the evidence in the case should leave you with a reasonable doubt whether the defendant had the previous intent or purpose to commit an offense of the character charged, apart from the inducement or persuasion of some officer or agent of the government, then it is your duty to find him not guilty.

The instruction should also make clear that the burden is on the Government to prove beyond a reasonable doubt that the defendant was not entrapped.

12. Those instructions provided in part:

If, then, the jury should find beyond a reasonable doubt from the evidence in the case that before anything at all occurred respecting the alleged offense involved in this case, the accused was ready and willing to commit crimes such as charged in the indictment, whenever opportunity was offered and that the Government agents did no more than offer the opportunity, the accused is not entitled to the defense of entrapment.

On the other hand, if the jury should find from the evidence in the case that the accused had no previous intent or purpose to commit any offense of the character here charged, and did so only because he was induced or persuaded by some agent of the Government, then the defense of unlawful entrapment is a good defense and a jury should acquit the defendant. (Footnote and emphasis omitted.)

363 F.2d at 173.

doubt that he was not entrapped. The charge, however, did inform the jury that the defense of entrapment was based on the policy of the law not to ensnare or entrap an innocent person, and that the Government must prove that the defendant was not entrapped beyond a reasonable doubt. The jury was also generally instructed that if the Government failed to prove the defendant guilty beyond a reasonable doubt, they must acquit him. Viewing the instructions as a whole, United States v. Jackson, 470 F.2d 684, 688 (5th Cir. 1972), cert. denied 412 U.S. 951, 93 S.Ct. 3019, 37 L.Ed.2d 1004 (1973), we think they protected the defendant and were sufficient to inform the jury of its duty.[13]

### C.

 18 U.S.C. § 2315 requires for federal jurisdiction that the stolen securities have a value of $5,000 or more. Gardner's final challenge to the jury instructions is that the court erred in charging the jury that the value of the ten $100,000 Treasury bills was to be determined at the time they were stolen. He argues that because he is being charged with receiving, concealing and storing stolen securities, the jury should have been instructed that the value of the securities is to be determined at the date of receipt. Because he asserts that the jury could have determined from the evidence that at the time of receipt the securities were worthless, he contends that the court's charge was highly prejudicial.

We need not consider whether the jury could have concluded that the securities were actually valueless at the time of receipt because value may properly be determined at the date of theft regardless of any subsequent change in worth. The purpose behind statutes penalizing the knowing receipt of stolen goods is not only to discourage the actual receipt, but also to discourage the initial taking

that the receipt encourages. *See* United States v. Bolin, 423 F.2d 834, 838 (9th Cir.), cert. denied 398 U.S. 954, 90 S.Ct. 1882, 26 L.Ed.2d 297 (1970). Since the $5,000 limitation in the statute was not designed to protect receivers of stolen goods, but only to avoid overtaxing the Department of Justice, United States v. Riso, 405 F.2d 134, 137 (7th Cir. 1968), cert. denied 394 U.S. 959, 89 S.Ct. 1306, 22 L.Ed.2d 560 (1969), determining value at the date of theft as well as the date of receipt, so long as that value at either time is $5,000 or more, advances the purposes behind the statute while at the same time maintaining the $5,000 limitation. Thus, we stated in *Riso, supra,* at 137:

> Under Section 2315 of the Criminal Code (18 U.S.C. § 2315), value can be determined by the market value of the property at the time and place of the theft (United States v. Tippett, 353 F.2d 335, 337 (4th Cir. 1965), certiorari denied, 383 U.S. 908, 86 S.Ct. 889, 15 L.Ed.2d 664), or by its value at any time during its receipt and concealment (cf. United States v. Kramer, 289 F.2d 909, 921 (2d Cir. 1961)).

Gardner relies on United States v. Gordon, 421 F.2d 1068 (5th Cir.), cert. denied 398 U.S. 927, 90 S.Ct. 1816, 26 L.Ed.2d 89 (1970), to support his contention that it is the date of receipt that controls. There, one count of the indictment charged the defendant with receiving two stolen diamond rings which were worth more than $5,000 at the time of their theft. The evidence showed, however, that what the defendant actually received were the mountings without the diamonds. Since the mountings were worth at most only several hundred dollars, conviction on that count was reversed.

The court did not find that because the diamond rings did not have a value of $5,000 or more at the date of receipt, federal jurisdiction did not exist. Rath-

---

**13.** We note that the Devitt and Blackmar instructions, *supra* note 11, expressly state that the defendant is to be found not guilty if there exists a reasonable doubt as to whether the defendant was predisposed to commit the crime charged.

**350**

er, the court found that the defendant did not receive diamond rings at all, but instead received separate parts of the rings having an independent value of less than $5,000, whether valued at time of theft or at time of receipt. Here, in contrast, Gardner received the actual securities that were stolen.

Under the court's charge the jury was required to find that the value of the securities was or exceeded $5,000 at the date of theft. Since the court instructed the jury to determine value at a correct time, there is no error.

### VIII.

■ In order to build his entrapment defense and to undermine the credibility of Leo Netzel, on direct examination Gardner inquired into Netzel's role in other stolen security cases in which he had also acted as a government informer. On cross-examination, the Government elicited from Netzel, over objection, that in one of those cases in which he acted as an informer and at which he appeared at trial as a witness, the particular defendant involved was convicted. Gardner's final attack on his conviction is that admission of that testimony was reversible error.

However, on redirect Gardner elicited that in another case in which Netzel was a government informer and a witness at trial, the defendant was acquitted. Further, in its instructions the court cautioned the jury that the testimony of an informer must be weighed with care. *See* note 4 *supra.* While we have doubts about the propriety of putting before the jury the outcomes of other cases, in the circumstances of this case we do not believe that the jury was improperly influenced. Thus, assuming error, we do not think it was harmful.

The judgment of the district court is affirmed.

Affirmed.