UNITED STATES of America,
Plaintiff-Appellee,

v.

Efrain MEDINA a/k/a Frank Medina,
Defendant-Appellant.

No. 76–1233.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 14, 1977.

Decided March 24, 1977.

Giles A. Franklin, Chicago, Ill., for defendant-appellant.

Samuel K. Skinner, U. S. Atty., Robert T. McAllister, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT and WOOD, Circuit Judges, and EAST, District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

In this case, defendant-appellant Efrain Medina (hereinafter referred to as defendant) was convicted of robbing the Norwood Park Catholic Credit Union in violation of 18 U.S.C. § 2113(a) and (d).[1] Defendant was sentenced to the custody of the Attorney General for a period of fifteen years.[2] On appeal, defendant raises the following issues for our consideration: 1) whether the trial court determined that defendant's confession was voluntary before submitting the confession to the jury; 2) whether defendant's confession was voluntarily given; 3) whether the pretrial identification procedures were so prejudicial that defendant was denied a fair trial; and 4) whether the trial court abused its discretion in refusing to submit defendant's Exhibit 2 to the jury at the close of the trial.

For the following reasons, we believe that defendant's conviction should be affirmed.

I

Briefly, the facts are as follows:

On September 11, 1975, the Norwood Park Catholic Credit Union, located at 7267 West Talcott Avenue in Chicago, was robbed by two men at around 12:20 P.M. The two men entered the credit union and announced a holdup. One robber carried a shotgun. Customers and employees of the credit union were ordered to lie down on the floor.

At the time of the robbery, James Conklin, manager of the Norwood Park Catholic Credit Union, was in his office sitting at his desk and talking on the telephone. A young man entered Conklin's office, put his finger on the button of Conklin's phone and told Conklin to hang up. The young man then told Conklin, "Don't touch anything. Come with me." The robber who entered Conklin's office was wearing a faded blue denim jacket and faded blue denim jeans. Conklin entered the reception area and laid down on the floor.

The robbers filled a shopping bag with money. As the robbers left the credit union one stated, "Don't anybody move. I wouldn't want to have to spray anybody."

On September 18, 1975, James Conklin identified defendant in a lineup conducted by the Chicago Police Department.

II

VOLUNTARINESS OF DEFENDANT'S CONFESSION

On the morning of September 18, 1975, while in the custody of the Federal Bureau

---

* The Honorable William G. East, United States Senior District Judge for the District of Oregon, is sitting by designation.

1. 18 U.S.C. § 2113 provides in part:
   (a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; or
   Whoever enters or attempts to enter any bank, credit union, or any savings and loan association, or any building used in whole or in part as a bank, credit union, or as a savings and loan association, with intent to commit in such bank, credit union, or in such savings and loan association, or building, or part thereof, so used, any felony affecting such bank or such savings and loan associa-

tion and in violation of any statute of the United States, or any larceny—
   Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both.
   * * * * * *
   (d) Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined not more than $10,000 or imprisoned not more than twenty-five years, or both.
   * * * * * *

2. The indictment alleged that Thomas D. Scott and defendant Medina robbed the Norwood Park Catholic Credit Union. The district court on November 7, 1975, granted Scott's motion for a separate trial.

of Investigation, defendant confessed to having participated in the robbery of the Norwood Park Catholic Credit Union. Defendant first argues that he was denied due process since the trial court failed to determine whether the confession was voluntary before submitting the confession to the jury. Defendant also asserts that even if the trial court made the necessary determination the confession was not voluntarily made.

### 1. District Court's Determination of Voluntariness

■ Prior to trial, defendant filed a motion to suppress his oral and written inculpatory statements. In an affidavit attached to his motion to suppress, defendant asserted that he was unable to comprehend the nature, scope, and import of the interrogation both because he was a heroin addict undergoing withdrawal and because he had ingested a hallucinogenic drug.

Prior to commencement of trial, the district judge held a hearing on defendant's suppression motion. At the conclusion of the suppression hearing, the court took the motion under advisement and indicated that a decision would be forthcoming on the following morning.

The trial commenced on the following morning, however, without mention of a ruling on the motion to suppress. Neither the trial judge nor either counsel referred to the scheduled ruling on the motion to suppress.

The confession was first discussed at trial during the testimony of Donald Branca. Branca testified that his wife Treva owned a yellow Ford Torino station wagon. In his written confession, defendant had indicated that he and Thomas Scott had borrowed a yellow Ford Torino station wagon from Scott's girl friend named Treva, and used that car in the robbery.

Defendant objected to Branca's testimony on the ground that the car owned by Branca's wife had not been tied into defendant's case. In overruling defendant's objection to Branca's testimony, the court stated:

Yes, based upon the fact that if it doesn't —I mean, I don't know, the confession will be subject to a motion to strike, and I am sure a subsequent instruction will be given to the jury—no, I will let him proceed. The objection is overruled. (Tr. 74)

Defendant's inculpatory statements were next referred to during the testimony of Thomas J. Green, Special Agent for the Federal Bureau of Investigation. Green testified about defendant's inculpatory statements made on September 18, 1975, with no objection by defense counsel. (Tr. 81–83) Similarly, Michael Kazmeir, Special Agent for the Federal Bureau of Investigation, followed Green on the witness stand and also testified about defendant's September 18, oral and written confession. (Tr. 94–98) Defense counsel again failed to object to this testimony.

At the conclusion of Kazmeir's testimony, the Government offered into evidence both the advice of rights form signed by defendant (Exhibit B) and the defendant's written confession (Exhibit A). The court admitted into evidence only the advice of rights form. As to Exhibit A the court stated:

I will reserve my ruling on Exhibit A until I hear further evidence with respect to it. (Tr. 107)

The final government witness was Special FBI Agent Joseph Burke. Burke also testified concerning defendant's inculpatory statements. (Tr. 113–120) Again, defense counsel did not object to Burke's testimony.

Following Burke's testimony, the Government reoffered and the court accepted into evidence the written confession signed by defendant. (Tr. 128) The trial judge simply stated, "It will be admitted into evidence." (Tr. 128)

Defendant points to the trial court's failure to expressly determine whether the confession was voluntary as a matter of law as required by *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), and *Sims v. Georgia,* 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593 (1967). Defendant asserts that since the record as a whole does not

establish whether or not the trial judge made the requisite ruling, this case should be reversed and remanded for a new trial or remanded for a hearing on this matter.

The Government argues in opposition that the failure to expressly rule on the question of voluntariness is at most a technical error. The Government urges that the trial court's compliance with the requirements imposed by the Court in *Jackson* and *Sims* can be implied from the record.

For the following reasons, we believe that the trial judge adequately fulfilled his responsibilities.

In *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), the Court reviewed the propriety of a New York rule which permitted a trial judge to exclude a confession only if under no circumstances the confession could be deemed voluntary. If, however, conflicting evidence on the issue of voluntariness was present, the ultimate determination was left to the jury. The Court first recognized that a defendant in a criminal case is deprived of due process if his conviction is based in whole or part upon an involuntary confession. *Jackson,* 378 U.S. at 376, 84 S.Ct. 1774. The Court also recognized that a defendant has a constitutional right "at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession." *Jackson,* 378 U.S. at 376–7, 84 S.Ct. at 1780.[3] The Court concluded that the New York procedures fell short of satisfying the constitutional requirements of a reliable and clear cut determination of the voluntariness of the confession:

> This procedure has a significant impact upon the defendant's Fourteenth Amendment rights. In jurisdictions following the orthodox rule, under which the judge

himself solely and finally determines the voluntariness of the confession, or those following the Massachusetts procedure, under which the jury passes on voluntariness only after the judge has fully and independently resolved the issue against the accused, the judge's conclusions are clearly evident from the record since he either admits the confession into evidence if it is voluntary or rejects it if involuntary. Moreover, his findings upon disputed issues of fact are expressly stated or may be ascertainable from the record. In contrast, the New York jury returns only a general verdict upon the ultimate question of guilt or innocence. It is impossible to discover whether the jury found the confession voluntary and relied upon it, or involuntary and supposedly ignored it. Nor is there any indication of how the jury resolved disputes in the evidence concerning the critical facts underlying the coercion issue. Indeed, there is nothing to show that these matters were resolved at all, one way or the other. 378 U.S. at 378–80, 84 S.Ct. at 1781. (Footnote omitted).

In *Sims v. Georgia,* 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593 (1967), the Court reviewed Georgia procedure which permitted the trial judge to determine only whether the state had made a prima facie showing that a confession was freely and voluntarily made. Having determined that a prima facie case was established, the jury was left to determine whether the confession was voluntary. Although the record was not clear as to whether the Georgia trial judge applied his own state procedure or followed the procedure set forth in *Jackson,* the Court relied on the state supreme court's ruling that the trial judge acted properly in following the Georgia rule. The Court stated that under *Jackson,* "it was for the trial judge to first decide" the issue of voluntariness. *Sims,* 385 U.S. at 543, 87 S.Ct. at 643.

---

**3.** The trial judge rather than the jury was entrusted with the primary responsibility of determining whether a confession was voluntary since the Court "did not believe a jury could be called upon to ignore the probative value of a truthful but coerced confession; it was also

likely . . . that in judging voluntariness itself the jury would be influenced by the reliability of a confession it considered an accurate account of the facts." *Lego v. Twomey,* 404 U.S. 477, 483, 92 S.Ct. 619, 623, 30 L.Ed.2d 618 (1972).

The Court also stated that the trial court's primary determination of voluntariness must appear clearly in the record:

> Although the judge need not make formal findings of fact or write an opinion, his conclusion that the confession is voluntary must appear from the record with unmistakable clarity. *Sims,* 385 U.S. at 544, 87 S.Ct. at 643.

Since the Court could not determine whether the trial judge had properly considered the voluntariness of the confession, the case was remanded for a hearing as provided for in *Jackson.*

The policy underlying the requirement that the record affirmatively must show that the trial court made the primary determination of voluntariness prior to submitting the question to the jury is apparent: "[w]ithout a clear showing of this kind in the trial record, it cannot be ascertained whether the trial judge was following the 'New York' procedure, rejected in *Jackson v. Denno,* or the 'Massachusetts' procedure, sanctioned in that decision." *Ellis v. Fitzharris,* 407 F.2d 799, 801 (9th Cir.1969).

We believe that the record adequately demonstrates that the court determined that defendant's confession was voluntary prior to submitting the confession to the jury.

First, defendant's motion to suppress in the present case clearly related to the question of the voluntariness of defendant's confession. Both the written motion filed with the court prior to trial and the evidence adduced at the suppression hearing related to the alleged inability of defendant to comprehend questions and his answers because of the effects of a hallucinogenic drug,

withdrawal, hunger, and physical abuse. There is no reason to doubt that the trial judge understood the nature and purpose of the suppression hearing.

Similarly, this case was not tried in a state trial court where doubt might exist as to whether a "New York" type procedure rather than the approved procedure set forth in *Jackson* and *Sims* was followed. Counsel for defendant at no time questioned whether the trial court had made the primary determination of voluntariness prior to submitting the confession to the jury. In addition, defense counsel did not object to testimony by Green, Kazmeir and Burke concerning the defendant's confession during the course of the trial. There is nothing in the record to indicate that the federal district court was not following federal law as set forth in *Jackson.*[4] See also *Erving v. Sigler,* 453 F.2d 843 (8th Cir.1972), cert. denied, 406 U.S. 976, 92 S.Ct. 2422, 32 L.Ed.2d 676.

The Court in *Jackson* stated that in jurisdictions where the judge fully and independently resolves the question of voluntariness, "the judge's conclusions are clearly evident from the record since he either admits the confession into evidence if it is voluntary or rejects it if involuntary." *Jackson,* 378 U.S. at 379, 84 S.Ct. at 1782. Similarly, the admission into evidence of the confession in the present case can be regarded as clearly evidencing the judge's conclusion that the confession was voluntary.

The cases relied upon by defendant are distinguishable.

In *Javor v. United States,* 403 F.2d 507 (9th Cir.1968), cert. denied, 404 U.S. 864, 92

---

**4.** In *United States v. Gardner,* 516 F.2d 334 (7th Cir.1975), cert. denied, 423 U.S. 861, 96 S.Ct. 118, 46 L.Ed.2d 89, the court denied defendant's motion to suppress at the close of the suppression hearing by merely stating, "The motion to suppress is overruled." The court stated that the district court's ruling was an adequate determination of voluntariness since the issue had been squarely placed before the trial court. The court also stated that if defense counsel did not understand the meaning of the ruling, "it would not have been difficult to speak up." 516 F.2d at 340.

In the case at bar, the voluntariness of defendant's confession was clearly before the court. Defense counsel did not, however, request a formal ruling on the motion to suppress. Nor did defense counsel object to testimony relating to the confession during the course of trial prior to the admission of the confession into evidence. If the defense counsel did not regard the admission of the confession into evidence as a sufficient ruling on the voluntariness of the confession, as in *Gardner,* it would not have been difficult to speak up.

S.Ct. 44, 30 L.Ed.2d 107, statements by the trial judge suggested that he regarded his function to be only that of determining whether the Government had made out a prima facie case on voluntariness, leaving to the jury the resolution of conflicting evidence. Since the court could not determine from the record as a whole whether the trial judge properly made an independent determination on the question of voluntariness, the case was remanded.

Similarly, in *Wallace v. Hocker,* 441 F.2d 219 (9th Cir.1971), the state trial judge made statements which indicated that he was not following *Jackson.* Accordingly, the court reversed and remanded the case to the district court to allow the state to provide a hearing or a new trial.

On the other hand, the record offers no basis in the case at bar for concluding that the trial judge was not properly following *Jackson.*[5]

We believe that it would have been the better practice for the trial judge to state that it found the statements to be voluntary by a preponderance of evidence and to give reasons for so concluding. *United States v. Gardner,* 516 F.2d 334, 341 (7th Cir.1975), cert. denied, 423 U.S. 861, 96 S.Ct. 118, 46 L.Ed.2d 89. We find, however, that under the particular circumstances of this case the record as a whole adequately reflects that the procedure set forth in *Jackson* and *Sims* was followed.

2. *Voluntariness of Defendant's Confession*

■ Defendant points to the following factors as evidence that his confession was involuntary: 1) defendant was physically abused during interrogation; 2) although police and FBI agents knew that defendant was on a methadone maintenance program, defendant was not given methadone during his overnight stay in jail; 3) defendant was inadequately fed; 4) defendant was hallucinating, dryheaving, suffering from cramps, feeling chilled, sweating and having hot flashes; 5) defendant was not informed of his right to have an attorney; 6) defendant was questioned intermittently from 2:00 P.M. September 17, 1975 to 12:30 P.M. September 18, 1975.

"If an individual's 'will was overborne' or if his confession was not 'the product of a rational intellect and a free will,' his confession is inadmissible because coerced." *Townsend v. Sain,* 372 U.S. 293, 307, 83 S.Ct. 745, 754, 9 L.Ed.2d 770 (1963) (footnotes omitted). As the Court in *Schneck-*

---

5. In the process of researching this point, we have discovered a line of Fifth Circuit cases which might be read as suggesting that a court's undisclosed determination that a confession is voluntary cannot satisfy *Jackson.* See *Smith v. State of Texas,* 395 F.2d 958 (5th Cir.1968); *Hackathorn v. Decker,* 438 F.2d 1363 (5th Cir.1971); *Fisher v. United States,* 382 F.2d 31 (5th Cir.1967).

As the Court indicated in *Jackson* and *Sims,* however, an express ruling on voluntariness is not always required. On the contrary, a ruling on voluntariness can be inferred from the record as a whole.

In addition, the Fifth Circuit cases are distinguishable.

Both *Smith* and *Hackathorn* involved a collateral attack on a Texas state court conviction. At the time both cases were decided, it was within the discretion of Texas trial judges to determine whether the equivalent of the "New York" procedure rejected in *Jackson,* or the "Massachusetts" procedure approved in *Jackson* would be followed. See *Hackathorn v. Decker,* 369 F.2d 150, 154–5 (5th Cir.1966), cert. denied, 389 U.S. 940, 88 S.Ct. 301, 19

L.Ed.2d 294. Thus, lack of clarity in the record as to which procedure the trial judge followed was properly found to be in violation of *Jackson.*

In *Fisher,* defendant Fisher and three other defendants filed motions to suppress several confessions on multiple grounds. The trial court overruled the motions to suppress as a whole with the understanding that separate rulings would be made during the trial. The court subsequently admitted one of the confessions in the face of multiple objections, one of which was that it had been obtained involuntarily. The failure to determine whether the confession was voluntary was held to violate *Jackson.*

In the case at bar, there was no apparent ambiguity as to the proper function of a federal trial judge for determining voluntariness of a confession. In addition, defendant in the present case sought to exclude his confession only on one basis, lack of voluntariness. Thus, in admitting the confession into evidence, we believe the court necessarily decided the question of whether the confession was voluntary.

*loth v. Bustamonte,* 412 U.S. 218, 225–6, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973) stated:

"The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self determination critically impaired, the use of his confession offends due process." *Culcombe v. Connecticut,* supra, 367 U.S. [568] at 602, 81 S.Ct. [1860] at 1879 [6 L.Ed.2d 1037].

The determination of voluntariness depends in each case upon consideration of the totality of the evidence. *Schneckloth,* 412 U.S. at 226, 93 S.Ct. 2041; *Blackburn v. Alabama,* 361 U.S. 199, 206, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960). No single criteria is controlling. All of the surrounding circumstances must be scrutinized. *Schneckloth,* 412 U.S. at 226, 93 S.Ct. 2041.

As we have indicated, the district court in holding the suppression hearing and admitting the confession into evidence determined that the confession was voluntary. For the following reasons, we believe that substantial evidence supports the lower court's finding that the confession was voluntary.

Defendant claims that he was not advised of his right to have an attorney present prior to the time he confessed. Substantial evidence in the record indicates, however, that defendant was advised of his right to an attorney. On the morning of September 18, defendant was taken from the Chicago Police Department's Shakespeare Station to the Chicago FBI Office by FBI Agents Burke and Kazmeir. Both Burke and Kazmeir testified that defendant was advised that he had been charged with robbery and was given the advice of rights form to read during the car ride to the FBI Office. According to Kazmeir, defendant read the advice of rights form out loud. Defendant again was given the advice of rights form

upon arrival at the FBI Office. Defendant signed the advice of rights form at 9:45 A.M. In addition, the written confession signed by defendant states that defendant read and signed the advice of rights form.

Defendant also suggests that his confession was not voluntary both because he was undergoing the effects of withdrawal and because he was acting under the influence of LSD. Defendant claims that he took one LSD pill before the police arrested him on September 17, and two more pills on September 18. Defendant asserts that at around 5:00 P.M. on September 17, he began to suffer from chills, hot and cold flashes, running nose, sweating, and fever because of the effects of LSD and withdrawal. Defendant claims that he requested methadone from the police but was turned down. Defendant's wife also testified that defendant was acting under the influence of LSD and was physically suffering from withdrawal.

On the other hand, members of the Chicago Police Department and FBI Agents who dealt with defendant on September 17 and 18 all testified that defendant was not physically ill and did not appear to be acting under the influence of a drug. In addition, the police officers and FBI agents stated that defendant did not request a doctor or methadone. Further testimony by police and FBI agents indicated that defendant understood the questions put to him and responded intelligently. The record indicates that defendant was willing to cooperate and described the robbery in detail.

Similarly, pictures taken of defendant at the lineup on the evening of September 17, also do not reflect that defendant was physically ill.

Thus, in light of the testimony of police and FBI Agents, and based on the record as a whole, we do not believe that defendant has shown that the confession was not the product of rational intellect and free will because of the effects of withdrawal or drugs. See *United States v. Taylor,* 508 F.2d 761 (5th Cir.1975); *Ortiz v. United States,* 318 F.2d 450 (9th Cir.1963), cert.

denied, 376 U.S. 953, 84 S.Ct. 971, 11 L.Ed.2d 972.

Defendant also complains that he was physically abused during interrogation by the Chicago Police. We have reviewed the transcript[6] and conclude that whatever physical contact occurred on the evening of September 17 in no way affected defendant's decision to confess on September 18.

Similarly, we do not believe that the additional factors referred to by defendant demonstrate that defendant's confession was involuntary.

As we stated in *United States v. Gardner*, 516 F.2d 334, 342 (7th Cir.1975), cert. denied, 423 U.S. 861, 96 S.Ct. 118, 46 L.Ed.2d 89:

> It is not our function to substitute our judgment for that of the district court, and where, as is the case here, the finding is substantially supported by the evidence, we will not overturn it.

For the foregoing reasons, we believe that substantial evidence supported the lower court's conclusion that defendant's confession was voluntary.

## III

## IN COURT IDENTIFICATION OF DEFENDANT

■ Defendant contends that pretrial identification procedures were so suggestive that it was error for the trial court to permit James Conklin to identify defendant at trial.

For the following reasons, we do not believe that defendant's due process rights have been violated.

As defendant's due process claim rests upon the facts, we must first review the relevant testimony in the record. *Neil v. Biggers*, 409 U.S. 188, 193, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

At the time of the robbery, James Conklin was sitting at his desk in his office and was on the telephone. A man entered, put his finger on the phone and told Conklin to hang up and not touch anything. Conklin testified that he looked up when the man entered. When the robber put his finger on the phone, he was standing about three feet away from Conklin. Conklin also testified that the office was light and that the office lights were turned on.

Conklin then went into the reception area and laid down on the floor.

According to Conklin, the robbery lasted about three minutes. Conklin stated that he was not nervous or frightened during the robbery.

On the day of the robbery, Conklin described the man who entered his office as a young negro man with a slight moustache and chin hair wearing faded denim jeans and a denim jacket.

6. Defendant testified as follows about this incident:

A. They were asking questions about the robbery.
Q. Who was?
A. Sergeants and other investigators.
Q. Sgt. Mucia?
A. Yes, and I told him that I had nothing to say—that was in the presence of my father—that I had nothing to say, and I got up and asked them if they would take me back to lockup, and that is when one of them slapped me and told me to sit down.
Q. Who slapped you?
A. I really couldn't tell you. There were about eight or nine of them.
Q. Was it Sgt. Mucia?
A. They all grabbed me and threw me down into the room, I mean into the chair.
Q. How many were in the room?
A. About seven or eight.
Q. And all seven of them grabbed you and threw you in the chair?
A. They all jumped on me.
Q. And how many of them hit you?
A. Just one.
Q. Were you hallucinating at this time or is this what happened?
A. After that I started hallucinating.
Q. And what happened when you started hallucinating?
A. I just started seeing weird things, kept thinking they were going to come and jump on me.
Q. And they did?
A. No, that was before. After they slapped me, that is when I started hallucinating, thinking that they were going to jump on me.
(Motion to Suppress Transcript 112–3)

Thereafter, Conklin identified defendant at a lineup held by the Chicago Police about one week after the robbery. Conklin stated that the lineup consisted of four men, all of whom were latinos. One individual was blacker than the rest. According to Conklin, two individuals had moustaches and two individuals wore levi jeans. When Conklin expressed fear that he would identify an innocent man, Conklin stated that the police replied, "the man is out there and I should be able to spot him." (Tr. 38) The members of the lineup were turned toward the wall. One at a time, each member of the lineup turned to face Conklin and then turned back to the wall.

At trial, Conklin identified defendant as one of the men who took part in the robbery. This court in *Israel v. Odom*, 521 F.2d 1370 (7th Cir.1975), set forth the procedure to follow in determining whether an in-court identification has been irreparably tainted by pretrial identification procedures:

In *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967), the Supreme Court held that if a pretrial confrontation "was so unnecessarily suggestive and conducive to irreparable mistaken identification" as to deny due process of law, a habeas corpus petitioner challenging the admissibility of testimony concerning the pretrial confrontation and a subsequent in-court identification, would be entitled to his requested relief. The Court cautioned, however, that a determination of this issue turns upon "the totality of the circumstances" presented by the particular case. This court, in *United States ex rel. Kirby v. Sturges*, 510 F.2d 397, 402–3 (7th Cir.1975), identified three interrelated aspects of the "totality of the circumstances" which must be considered in a case such as the present. First, the court must determine whether the police procedures at issue in the case were, in fact, suggestive. If such suggestiveness is found, the court must next consider whether any unusual or exigent circumstances existed which might, at least in part, have justified the use of the faulty procedures. Finally, and most critically, the court must examine the reliability of the identification, in spite of the suggestive nature of the confrontation. It is clear that the reliability issue is the determining factor in this examination and unjustified, suggestive procedures may be overborne when there are present sufficient indicia of reliability. *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). *Israel*, 521 F.2d at 1373 (footnote omitted).

Defendant argues that the pretrial identification procedure was suggestive in the following respects: 1) since Conklin was not allowed to view all four members of the lineup simultaneously, defendant was placed in a show-up rather than a lineup; 2) Conklin testified that the members of the lineup were largely dissimilar; 3) defendant wore the same clothes in the lineup as the robber wore at the time of the commission of the crime; and 4) Conklin was told by the police that the robber was in the lineup.

First, we do not believe that the defendant was placed in a show-up rather than a lineup. As the Court has stated, "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967); *Foster v. California*, 394 U.S. 440, 443, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). Although the members of the lineup were viewed one at a time, defendant was one of four individuals viewed by Conklin. In addition, a show-up is not *per se* violative of due process. *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

Similarly, Conklin's statement that members of the lineup were dissimilar does not lead us to believe that the lineup was suggestive. Conklin's statement was in the context of a series of questions concerning what he had noticed about the members of the lineup. After stating that all four individuals were latinos, that all were approxi-

mately the same age, that one was shorter than the others, and that two individuals had moustaches, Conklin stated:

> Well, the thing I noticed is that they were largely dissimilar, and the man I picked out was unquestionably the man I saw. (Tr. 36)

As the Government stated in its brief, the term dissimilar was apparently used by Conklin to indicate how sure he was of his identification. In addition, we have examined pictures of the lineup and do not believe that the members of the lineup were in fact prejudicially dissimilar.

Defendant also contends that the lineup was tainted since defendant was placed in the lineup wearing the same clothes as the robber wore at the time of the commission of the crime. Defendant was not, however, dressed exactly as the robber was dressed. On the day of the robbery, Conklin told the police that the robber wore a faded denim jacket as well as faded denim blue jeans. Defendant was not wearing a denim jacket during the lineup. Similarly, nothing in the record demonstrates that defendant was required to wear denim pants during the lineup. In addition, nothing in the record indicates that Conklin's identification was based upon the fact that defendant was wearing denim pants. See *Coleman v. Alabama,* 399 U.S. 1, 6, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970). Finally, denim pants were not the outstanding feature of the robber's appearance to Conklin nor were they an integral part of the description provided the police. See *Israel v. Odom,* 521 F.2d 1374; *United States ex rel. Pierce v. Cannon,* 508 F.2d 197, 202 (7th Cir.1974). We do not believe that the fact that defendant wore denim pants, a common item of clothing, at the lineup created the same danger of misidentification as where "an identifying witness has his attention focused exclusively on the clothes worn and thereby [is] distracted from other important physical characteristics." *Cannon,* 508 F.2d at 202.

Defendant also complains that Conklin was told by the police that the robber was in the lineup. Conklin testified that the statement was made by the police in the following context:

> Well I was told, of course, that—I said I don't want to identify—I don't want to single out an innocent man, and they told me not to be worried, that the man is out there and I should be able to spot him. (Tr. 38)

Conklin also indicated that the police did not point to defendant and say that he (defendant) was the robber.

The Government properly admits that the police should not have told Conklin anything about the lineup. We believe along with the Government, however, that the statement did not result in a suggestive lineup. Whenever a witness is asked to view a lineup, an inference may often be present that a definite suspect is among those taking part in the lineup. Thus, the statement by the police did not make the selection of defendant more likely.

Even if we assume that the lineup was suggestive, we would nonetheless find that the identification was sufficiently reliable to avoid a due process violation.

In *Neil v. Biggers,* 409 U.S. at 199–200, 93 S.Ct. at 382, the Court identified the following five factors which should be considered in determining whether an identification was reliable:

(1) the opportunity of the witness to view the criminal at the time of the crime;

(2) the witness' degree of attention;

(3) the witness' prior description of the criminal;

(4) the level of certainty demonstrated by the witness at the confrontation; and

(5) the length of time between the crime and the confrontation.

First, the facts in the present case indicate that Conklin had an adequate opportunity to view the robber at the time of the crime. The robber stood only about three feet away from Conklin in a well lighted office.

Second, Conklin's testimony about the robber who entered his office indicates that Conklin was highly attentive to the situa-

tion. Conklin stated that he was neither nervous nor frightened and his testimony described the robbery in detail.

Third, Conklin described the robber to the police on September 11, as a young negro, with a slight moustache and chin whiskers. Since the defendant is not a negro, defendant argues that Conklin's prior description was not accurate. The lineup pictures indicate, however, that defendant has a dark complexion and that Conklin's description was largely accurate.

Fourth, Conklin indicated that he had no question in his mind when he picked defendant out of the lineup.

Finally, the length of time between the crime and the lineup was only about one week.

For the foregoing reasons, we do not believe that defendant's due process rights were violated by Conklin's in-court identification of defendant.

## IV

### EVIDENCE NOT SENT TO JURY

Defendant sought to prove as an alibi that at the time of the robbery on September 11, 1975, he and his wife were purchasing a used car from G. Comet Motors, Inc., (hereinafter referred to as Comet). Defendant's Exhibit No. 2 was a bill of sale from Comet dated September 11, 1975. Defendant's wife testified that she signed the bill of sale after it was filled out and notarized by a salesman from Comet on September 11. George Chiarelli, Jr., a car salesman from Comet, testified that he filled out and notarized the bill of sale for defendant and his wife. Chiarelli further testified that defendant and his wife were present at Comet from 12:30 P.M. or 12:45 P.M. to 1:00 P.M. or 1:15 P.M. on September 11.

Defendant offered defendant's Exhibit No. 2 into evidence only as to the date, September 11, 1975, which appeared thereon. (Tr. 168–9) The trial court received defendant's Exhibit No. 2 into evidence as to the date only.

At the conclusion of the trial, the court ruled that defendant's Exhibit No. 2 would not be sent back to the jury.[7]

Defendant asserts that the lower court's ruling which prevented defendant's Exhibit No. 2 from being taken by the jury to the jury room had the prejudicial effect of sug-

---

7. The following dialogue accompanied the court's ruling:

Mr. Mulroy: There is one more thing, your Honor.
Mr. Gilbert: There always is.
Mr. Mulroy: I just thought of it. The title to the car went in—the date of it only went in. Therefore, I would request instead of a limiting instruction, that the title not go back to the jury.
Mr. Gilbert: Well, that is not the title, that is the bill of sale.
Mr. Mulroy: The bill of sale.
The Court: It is the bill of sale, and it has been admitted into evidence, hasn't it?
Mr. Gilbert: Yes.
Mr. Mulroy: Only the date, if your Honor recalls.
Mr. Gilbert: At that time you limited it as to the date.
The Court: Oh, that I agree with you.
Mr. Mulroy: Thank you.
The Court: It will not go back in. All the rest of the exhibits that have been admitted into evidence, you two will get together when the jury retires and see to it that they go back there.

Mr. Gilbert: Of course, your Honor, as far as—I might mention the fact that Mr. Mulroy made quite a point in his examination regarding the funds that went in to pay for the car, the amount of funds and so on, which are reflected on that bill of sale. He also made a point—
The Court: I did it as to the date solely to stay away from the time element.
Mr. Gilbert: Right.
The Court: Such as 10:30 in the morning.
Mr. Gilbert: Well, we had direct testimony on that.
The Court: That is the restriction that I put on it.
Mr. Mulroy: But the restriction would be meaningless if it was published to the jury.
Mr. Gilbert: Well, for what it is worth—
Mr. Mulroy: Oh, no, we can't—
Mr. Gilbert: It is going in there to prove that the car was—
The Court: No, counsel, I will not permit it to go back.
(Tr. 296–7)

gesting that defendant's alibi defense was not believed by the trial judge.

"The taking of exhibits by the jury to their room is a matter primarily within the sound discretion of the court." *United States v. Gross,* 451 F.2d 1355, 1359 (7th Cir.1971). Although we believe that the lower court abused its discretion in permitting all of the Government exhibits to be taken into the jury room while barring the jury from receiving defendant's Exhibit No. 2, we find that this was harmless error. Fed.R.Crim.Pro. 52(a). This is true since additional proof as to the date of the automobile purchase was contained in testimony by George Chiarelli, Jr., and defendant's wife. In addition, both Mr. Chiarelli and defendant's wife also testified as to the time of the purchase.

## CONCLUSION

For the foregoing reasons, we hereby affirm the conviction of the defendant.

SWYGERT, Circuit Judge, dissenting.

I cannot agree with the majority that this case is free from reversible error. The due process rights of the defendant were violated by the trial judge's noncompliance with the requirements of *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), and *Sims v. Georgia,* 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593 (1967), when he failed to make a specific ruling on the voluntariness of the defendant's confession. The Government argues, and the majority seems to agree, that this failure was, at most, merely a technical slip-up and that the judge made a finding of voluntariness which can be inferred from the record as a whole. I can find nothing in the record which would allow an inference that the trial judge ever made such a determination. The majority, citing *Sims,* says a finding of voluntariness need not be formal or in opinion form. The Court, on the other hand, requires that a finding that a confession is voluntary "must appear from the record with unmistakable clarity." 385 U.S. at 544, 87 S.Ct. at 643. That the trial judge in the instant case made a decision that de-

fendant's confession was voluntary is by no means unmistakably clear; the record on that score, is in fact, ambiguous.

In support of its holding that a ruling by the trial judge that the confession was voluntary can be inferred from the record, the majority cites *Erving v. Sigler,* 453 F.2d 843 (8th Cir. 1972), *cert. denied,* 406 U.S. 976, 92 S.Ct. 2422, 32 L.Ed.2d 676. In *Erving,* the trial judge held a separate hearing on the issue of voluntariness. Before the end of the hearing, the defendant's counsel made a specific motion against the admission of any testimony concerning the proffered confession. The court deferred ruling on the motion until all the evidence relating to the confession was completed. At the end of the hearing, the judge specifically denied all the motions and objections of the defendant to testimony concerning the confession. Thus, although no specific finding of voluntariness in terms was made by the trial judge in *Erving,* such a finding was readily inferable with "unmistakable clarity" from the record.

The same cannot be said for the record in the instant case in which the circumstances are completely different. Whereas the trial judge in *Erving* made a ruling at the end of the suppression hearing on specific motions directed against testimony concerning the confession, the judge in the case at bar made no specific decision at the end of the suppression hearing, but indicated at least twice during the trial that he was unsure how to rule on admissibility, and admitted the confession only at the close of the Government's case-in-chief.

What the majority permits to stand is a loose practice that subverts the holding in *Sims.* This is especially so when the judge actually demonstrated that he remained unsure on the question of voluntariness after the hearing at which this issue was to be determined and at the time he actually allowed the jury to hear the confession. The jury was permitted to hear evidence referring to the confession at a time when the judge was unsure as to its admissibility. When he later admitted it, there was nothing to indicate what prompted the admis-

sion and how he viewed the jury's role vis-à-vis the confession. Thus, the possibility that the judge may have used the wrong standard, such as those encountered in *Jackson* and *Sims,* is not precluded by the record.

A further problem arises in the instant case from the procedure employed by the trial judge. *Jackson* declared the right of a defendant to have the issue of voluntariness determined from evidence taken at a separate hearing before the jury hears anything of the confession. Here the district judge indicated, not only that he had not made a decision at the end of the hearing, but that he would wait until he heard further evidence being submitted to the jury during the trial, implying that any forthcoming decision might be based upon the additional testimony. *Jackson* clearly requires the Government to bear the burden at the *suppression hearing* of proving the voluntariness of defendant's confession. Even if the district judge's remarks could be construed to constitute a decision on the voluntariness issue after he had heard all the testimony of the Government's case-in-chief, it can hardly be inferred that he found that the Government had borne its burden at the initial hearing.

If we allow a ruling to be inferred in dubious situations such as presented here merely because the trial judge has made no positive indication that the question was left to the jury, there exists the dangerous possibility that a trial judge could shirk his duty to decide the issue of voluntariness of a confession, leaving borderline cases for the jury to decide. Such a dereliction of duty runs counter to the holdings in *Jackson v. Denno* and *Sims v. Georgia.*

I would reverse and remand for a new trial.