**UNITED STATES of America**

v.

**Isaac Marion PRESCOTT, Jr.**

**Crim. A. No. 79–147.**

United States District Court,
W. D. Pennsylvania.

Oct. 26, 1979.

James Garrett, Asst. U. S. Atty., Pittsburgh, Pa., for plaintiff.

Thomas S. White, Asst. Federal Public Defender, Pittsburgh, Pa., for defendant.

## OPINION

SNYDER, District Judge.

Defendant Isaac Prescott, charged with bank robbery at the First National Bank of Mercer County, Farrell, Pennsylvania, in violation of 18 U.S.C. §§ 2113(a) and (b), has filed pretrial motions seeking to suppress a statement and physical evidence illegally obtained, a motion to conduct a lineup and a blank lineup, and a motion to suppress eyewitness testimony on the grounds that photographic displays were unduly suggestive. After due consideration of the testimony presented, and after argument by counsel, the motion to suppress certain physical evidence will be partially granted, the motion for a lineup will be denied, the motion for a blank lineup will be denied, and the motion to suppress eyewitness testimony will be denied.

### I. *Motion to Suppress Statement and Physical Evidence*

Defendant seeks to suppress the use of fingerprints and photographs taken following his arrest by the Youngstown Police[1] on August 25, 1979, based on the allegation that the arrest was without probable cause.

Richard Hart, the Youngstown police officer who, with his partner, arrested Prescott, testified he had been dispatched by radio to the emergency room of Youngstown's Northside Hospital at approximately 5 A.M., August 26, 1979, in response to a call from the security officers at the Hospital stating that Prescott refused to leave the premises. Upon arrival, the officers found Prescott in the waiting area of the emergency room and he stated that he was waiting for a taxi. While Prescott could not say where he lived, he did hand over to the officers his wallet containing a receipt

---

1. Youngstown, Ohio is approximately 15 miles from Farrell, Pennsylvania.

for a room at the Y.M.C.A. Prescott says he was suffering at the time from an overdose of cocaine, but Hart testified that, other than not recalling where he lived, Prescott appeared to be normal and was not disoriented. Hart stated he verified by telephone the fact that Prescott did have a room at the Y.M.C.A., with the rent paid through August 25, 1979. Hart found out that the Federal Bureau of Investigation (FBI) was looking for Prescott, although he was not told at that time the reason for the FBI's interest in him. Hart also learned at the Hospital that Prescott was a Hospital employee with a history of previous discipline problems, that he was at that time on "sick leave", and was informed by the security guard that he would file a criminal trespass complaint against Prescott. It was at this point that Hart and his partner arrested Prescott. He was taken to the Youngstown lock-up, was booked on a charge of criminal trespass, and on the following day, the security guard filed the formal complaint.

■ Recently, in *Michigan v. DeFillippo*, —— U.S. ——, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979), it was held that a warrantless arrest is constitutionally permissive if the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person's belief that the suspect is committing, or *is about to commit*, an offense. Thus, the validity of the arrest does not depend on whether the suspect has in fact committed the offense at the time of arrest. *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975).

■ The Defendant submits that technically he could not be guilty of trespass since he was merely in the Hospital waiting for a taxi after his release, or, in any event, because he was an employee of the Hospital, although on sick leave at the time of his arrest. But, as we have seen, this is not determinative of the question raised. To the contrary, we believe, the record indicates that Prescott's arrest by the Youngstown Police for criminal trespass was clearly with probable cause. The information received by Hart from the Hospital's security guard indicated that Prescott refused to leave the premises, although he was requested to do so, and was demanding treatment which the Hospital had refused to give. There was a clear indication that Prescott was committing a criminal trespass, and the arrest was thus with probable cause.

■ By a motion to amend the Defendant's motion to suppress, which we have allowed, Prescott contends that the violation for which he was arrested was a misdemeanor of the fourth degree (Ohio Stat. § 2911.21; § 2929.21, setting forth the penalty for violation of misdemeanors; § 2935.-03, authorizing arrest without a warrant when the offense is being committed in the officer's presence). Although the motion to amend sets forth that the Government consented to the grant of the motion, upon inquiry by the Court, the Government has refused to take any position whatsoever with respect to the motion. Noting that the motion did not request additional hearing, and believing we should consider the substance of the motion, the motion to amend was granted.

The amended motion then avers that Prescott's arrest was without legal authority because the Defendant was arrested for criminal trespass when the misdemeanor was not being committed in the officers' presence. The testimony, however, was to the contrary that the officers' sole interest in Prescott was in seeing that he left the premises and, when he refused to leave in their presence, they then took him to the lockup. We are not unmindful that the officers knew at that time that the FBI was looking for Prescott, but the officers had probable cause to arrest Prescott, and did so. It was his commission of an offense in their presence for which he was arrested, and not because of any information they had received from the FBI. The motion to suppress the fingerprints and photographs taken at the time of arrest will be denied.

## II. *Consent to Search*

Following Prescott's 5 A.M. arrest, FBI Agents Roberts and Wilson of the Youngs-

town Office arrived at the Jail at approximately noon to interview Prescott about the robbery. Prescott was advised of their identity as FBI Agents, read his constitutional rights,[2] and signed the waiver of rights form[3] and a consent to search form.[4] Prescott admits signing the waiver of rights and consent to search forms but claims that he did not read them because his eyes were scratchy, that he was still recovering from dope, and he only signed the forms because the Agents told him it would be helpful to do so, and that they never explained to him exactly what the forms meant.

Agent Roberts testified that Prescott walked into the room and, except for bloodshot eyes and looking like he needed sleep, he was responsive and cooperative. Roberts told Prescott that signing the forms was strictly voluntary and that he could refuse to do so. Roberts said that Prescott apparently read the forms, as he saw his lips moving. No one, including Prescott, indicated Prescott might be on drugs or intoxicated, and he appeared to Roberts to be normal except that in the interview it was only after considerable prodding that Prescott remembered recent events. After obtaining the consent to search from Prescott, the Agents searched the room at the Y.M.C.A. which was rented to Prescott, and the return shows:

2. The Advice of Rights form reads as follows: "Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer."

3. The Waiver of Rights states: "I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats

"August 26, 1979
Youngstown, Ohio

Pursuant to a written consent signed by ISAAC M. PRESCOTT, JR., a search was conducted of Room 509, YMCA, Champion St., Youngstown, Ohio, by Special Agents MILLARD J. ROBERTS, JR. and HARRY J. WILSON of the Federal Bureau of Investigation (FBI). The following items were removed from Room 509 during this search:

1. Message dated 8/22 indicating someone brought keys—Message left re money.

2. Message dated 8/22 indicating person left car with looking for him.

3. White mesh laundry bag with white cloth tag 'PRESCOTT, I. 022 049.'

4. White mesh laundry bag with white cloth tag '049'

/s/ Millard J. Roberts, Jr., Special Agent, FBI, Youngstown, Ohio

/s/ Harry J. Wilson SA FBI, Ygst Ohio

Copy left at YMCA for Isaac Prescott, Jr."

 In determining whether consent to search is voluntarily given, the court must look to the totality of the circumstances. *United States v. Scott*, 590 F.2d 531 (3rd Cir. 1979). Prescott contends here that because the consent to search form failed to

have been made to me and no pressure or coercion of any kind has been used against me."

4. The consent to search form states: "I, Isaac M. Prescott, Jr., having been informed of my constitutional right not to have a search made of the premises hereinafter mentioned without a search warrant and of my right to refuse to consent to such a search, hereby authorize Millard J. Roberts, Jr., and Harry J. Wilson, Special Agents of the Federal Bureau of Investigation, United States Department of Justice, to conduct a complete search of my premises located at Room 509, YMCA, Champion Street, Youngstown, Oh These agents are authorized by me to take from my premises any letters, papers, materials or other property which they may desire.

This written permission is being given by me to the abovenamed Special Agents voluntarily and without threats or promises of any kind."

state what procedure would be followed if he refused, the consent was not voluntarily given. Knowledge of the right to refuse a search request is one factor to be taken into account, and the prosecution need not prove this in order to establish voluntary consent. *United States v. Juarez*, 573 F.2d 267 (5th Cir. 1978), *cert. denied* 439 U.S. 915, 99 S.Ct. 289, 58 L.Ed.2d 262 (1978).

We find from the totality of the circumstances in this case that the consent to search was voluntarily given. Prescott was given a consent to search form, was told that it was strictly voluntary, was observed reading it, and admitted signing it. *See United States v. Sledge*, 546 F.2d 1120 (4th Cir.), *cert. denied* 430 U.S. 910, 97 S.Ct. 1185, 51 L.Ed.2d 588 (1977). *See also United States v. Alexander*, 441 F.2d 403 (3rd Cir. 1971) (oral warnings not required, written warnings are sufficient). There is no evidence to indicate that Prescott did not understand his rights. The unproved assertion by Prescott that he was unable to freely give consent as a result of his condition, does not invalidate the consent. *Wolfrath v. LaVellee*, 576 F.2d 965 (2d Cir.), *cert. denied* 439 U.S. 933, 99 S.Ct. 325, 58 L.Ed.2d 328 (1978). The testimony of Agent Roberts shows that although Prescott's condition may not have been the best, he was nonetheless responsive and was not physically ill. *See United States v. Medina*, 552 F.2d 181 (7th Cir.), *cert. denied* 434 U.S. 839, 98 S.Ct. 132, 54 L.Ed.2d 102 (1977).

Failure to explain in detail the procedure to be followed if the Defendant refused to consent to a search is not persuasive when Prescott admitted signing the consent and was specifically told that it was voluntary, and when he stated he wanted to be as cooperative as possible. His oral statements are admissible.

### A. *Coercion and Promises*

Prescott was also interviewed in the Youngstown Jail on August 27, 1979 by FBI Agents G. Victor Reuschlein and Duane L. Pruto of the Pittsburgh Office. Prescott was again advised of the Agents' identity and furnished with an advice of rights form which he read, stated he understood, and signed. As the questioning continued, Prescott eventually made oral admissions about the bank robbery. No attempt was made to obtain a written statement.

Prescott claims that his oral statements were involuntarily given because the FBI Agents convinced him that he was the person who robbed the bank, although he had no memory of the events of that day, and that his cooperation was induced by a promise that if he cooperated the Agents would tell the United States Attorney and it would go easier for him.

It is true that a confession which is extracted by the use of threats, violence, inducements or promises is not voluntary. *Hutto v. Ross*, 429 U.S. 28, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976). However, a representation that the fact of cooperation will be made known to prosecuting authorities is insufficient to make a confession involuntary. *United States v. Curtis*, 562 F.2d 1153 (9th Cir.), *cert. denied* 439 U.S. 910, 99 S.Ct. 279, 58 L.Ed.2d 256 (1978). Prescott was not promised leniency in exchange for his admissions. *Bram v. United States*, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed 568 (1897), and the holding of *Hutto, supra*, have never been applied to invalidate confessions based on a defendant's implications from such a statement. *United States v. Ferrara*, 377 F.2d 16 (2nd Cir. 1967) (confession voluntary where federal agent indicated that cooperation would result in reduced bail). *See also United States v. Springer*, 460 F.2d 1344 (7th Cir.), *cert. denied* 409 U.S. 873, 98 S.Ct. 205, 84 L.Ed.2d 125 (1972) (oral confession valid where defendant was told U.S. Attorney and judge would be made aware of his cooperation); *United States v. Frazier*, 434 F.2d 994 (5th Cir. 1970) (per curiam) (confession not involuntary by reason of the fact defendant was told his cooperation would be made known to FBI).

From the totality of the circumstances here, we conclude that Prescott's will was not overborne and his admissions to FBI Agents were voluntarily given. The motion to suppress on this basis is denied.

### III. *The Second Search*

James S. Cossler, Dormitory Supervisor of the Youngstown Y.M.C.A., testified that Prescott occupied Room 509 and that the rent was paid to August 25, 1979. Sometime between August 26 and September 5, 1979, Cossler received a phone call from Prescott who said he would send someone over for his belongings, but Cossler told him that he would have to pay one week's rent ($20) and reimburse the Y.M.C.A. for a bad check ($100) before he could get his clothes. Cossler also told Prescott that his clothing would be held for a 60 day period and would then be turned over to a charity, unless he paid the $120.00 within the 60 days.

On September 5, 1979, while Prescott was still in jail, FBI Agent Muehlstedt contacted Cossler and asked to be let into Room 509, last occupied by Prescott. Cossler consented and permitted the Agent to remove a green T-shirt from Prescott's duffel bag needed for evidence, and Cossler received a receipt. Relying on the circumstances, Prescott claims he still had right of possession to the duffel bag and its contents, and contends that a search warrant was required for a valid seizure.

■ The Fourth Amendment prohibits "unreasonable searches and seizure", and any evidence obtained by an illegal search and seizure and the fruits of such illegal search must be excluded. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). It was held in *Katz v. United States*, 389 U.S. 347, 58 S.Ct. 507, 19 L.Ed.2d 576 (1967), that the Fourth Amendment protections apply when an individual has a "reasonable expectation of privacy." *See also United States v. Speights*, 557 F.2d 362 (3rd Cir. 1977).

■ Application of the Fourth Amendment does not turn on the nature of the property interest involved but on the reasonableness of the expectation of privacy. Thus, a hotel room can be the object of Fourth Amendment protection. *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). *See also Gillard v. Schmidt*, 579 F.2d 825 (3rd Cir. 1978) (school guidance counselor has reasonable expectation of privacy in his school desk).

■ Although the tenant or co-occupant of an apartment may consent to the search of the premises, a consent is insufficient to justify a warrantless search when the searched item is the exclusive property of the guest. *United States v. Isom*, 588 F.2d 848 (2d Cir. 1978). When consent is given by a third party, in order to be valid, the third party must possess common authority of access and right to control the effects to be inspected. *United States v. Matlock*, 415 U.S. 164, 171 & n.7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *United States v. Carter*, 569 F.2d 801 (4th Cir. 1977), *cert. denied* 435 U.S. 973, 98 S.Ct. 1618, 56 L.Ed.2d 66 (1978) (common authority rests on mutual use so that the individual has assumed the risk that the other person might consent).

■ The testimony indicates that Prescott took steps to secure the return of his belongings and was told they would be held for at least 60 days before the Y.M.C.A. disposed of them. This is not a case involving co-tenants or parties with common authority or control. On being informed that his belongings would be held for 60 days, Prescott had a justifiable expectation of privacy in his belongings, and he did not assume the risk that other people would consent to a search of his belongings.

We agree with the Defendant that the Y.M.C.A. was without authority to consent to a warrantless search of Prescott's belongings in his room at the Y.M.C.A. The motion to suppress is granted as to the T-shirt and all other evidence gathered and obtained from this unauthorized search.

### IV. *Motion for Lineup and Blank Lineup*

Defendant contends that, in the interests of justice, a physical lineup should be conducted since the eyewitnesses to be called by the prosecution based their identification of him only from photographs.

 There is no constitutional right to a lineup. However, the trial court, in its discretion, may grant such a request. *United States v. Estremera*, 531 F.2d 1103, 1111 (2d Cir.), *cert. denied* 425 U.S. 979, 96 S.Ct. 184, 42 L.Ed.2d 804 (1976); *United States v. McGhee*, 488 F.2d 781 (5th Cir. 1974); *United States v. Smith*, 473 F.2d 1148 (D.C.Cir. 1972). Although a lineup may be preferred over photographic identification when a suspect is available, it is not a requirement. *United States v. Marchand*, 546 F.2d 983 (2d Cir. 1977).

In *United States v. Ravich*, 421 F.2d 1196, 1203 (2d Cir. 1970), the court stated:

"[W]e can well see how a prompt line-up might be of value both to an innocent accused and to law enforcement officers. A pre-trial request by a defendant is thus addressed to the sound discretion of the district court and should be carefully considered. Without any attempt at being exhaustive, . . . some relevant factors are the length of time between the crime or arrest and the request, the possibility that defendant may have altered his appearance . . . , the extent of inconvenience to prosecution witnesses, the possibility that revealing the identity of the prosecution witnesses will subject them to intimidation, the propriety of other identification procedures used by the prosecution, and the degree of doubt concerning the identification."

 In this instance, eyewitness identification of Prescott was accomplished through the submission of photographs to various witnesses on August 30, 1979, six days after the bank robbery on August 24th. A pretrial lineup would not therefore assure the reliability of the identification, especially since there was not a significant lapse of time from the date of the photographic identification, and the motion for lineup will be denied.

### A. The Blank Lineup

 In order to avoid suggestiveness in the lineup, Defendant has also requested that a blank lineup be conducted in two arrays, the first to omit the Defendant, and the second to include him. As long as the lineup includes persons of similar height, weight, and general appearance, it is not suggestive. *United States v. Alden*, 576 F.2d 772 (8th Cir.), *cert. denied* 439 U.S. 855, 99 S.Ct. 167, 58 L.Ed.2d 151 (1978); *Martinez v. Turner*, 461 F.2d 261 (10th Cir. 1972). This is true even if the witness is told by the police that the subject is in the lineup, or if the witness is aware of the suspect's presence. *United States v. Medina*, 552 F.2d 181 (7th Cir.), *cert. denied* 434 U.S. 839, 98 S.Ct. 132, 54 L.Ed.2d 102 (1977); *United States v. Smallwood*, 153 U.S.App.D.C. 387, 473 F.2d 98 (D.C.Cir. 1972). "Whenever a witness is asked to view a lineup, an inference may often be present that a definite suspect is among those taking part in the lineup." *Medina, supra*. In light of our ruling on lineup, and since there has been no showing of the necessity for a blank lineup, the motion for blank lineup will be denied.

### V. Motion to Suppress Eyewitness Testimony

Defendant seeks the suppression of eyewitness identification, contending that the photographic display which is the basis of the identification was suggestive and that suggestive statements were made during the presentation of these photographs.

Agent Reuschlein testified that on August 30, 1979, two days after the indictment was returned by the grand jury, and six days after the bank robbery on August 24, 1979, he reinterviewed the eyewitnesses and showed them a display of six photographs, one of which was of the Defendant. (These were offered in evidence.) The front and side views of each were stapled together with all police data blacked out, and the names of the suspects appearing on the back of each photograph were not exhibited. The witnesses were not told whether the display included a photograph of a suspect.

Captain Gartner, who saw an individual walking briskly away from the bank immediately after the robbery, testified that when the photos were shown he was asked

if he could recognize anyone who looked familiar, or if he could pick out the man he saw at the bank. Gartner, who was unaware of Prescott's apprehension, identified Prescott's photograph as being the man he saw. Gartner previously had described the person he saw as a light skinned Negro male, approximately 5′5″ in height, with short cropped hair, and dressed in a T-shirt.

Antoinette Richards, a bank customer during the robbery, saw the face of the person robbing the bank as he removed his mask at the vestibule door while exiting the bank. She described him as a tall, thin Negro, 5′5″–5′7″, with no beard, in his early twenties, wearing a dark jacket, and with a rust hood over his head. She was not told that a suspect was in the group of photographs and identified Prescott after she had immediately eliminated three photographs because the individuals were "too heavy". She studied the remaining pictures carefully and testified that she chose the one of Prescott "because his face was the same".

Joseph Rucker testified that while waiting for a red light near the bank at the time of the robbery, he saw a man running through the parking lot next to the bank and into an adjacent alley. Although Rucker said he is color blind and unable to testify as to the color of the clothing worn, he described the man as tall, thin build, 6 foot—145 pounds, with a medium light complexion, clean shaven, wearing a jacket, no hat, and with a bag draped over his arm. When Rucker was shown the photographic array, he was asked to look at them to identify the man he saw, and was not told that the robber was among the pictures. Rucker went through the photos twice to insure he made no mistake and then picked the Defendant's photograph, because it "looked like the right person".

■ To prevent the likelihood of a misidentification, we must first decide whether the procedure was impermissibly suggestive, and then determine whether even a suggestive identification is reliable under the totality of the circumstances. *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2264, 53 L.Ed.2d 140 (1977); *Neil v. Biggers*, 409

U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *United States v. Snead*, 447 F.Supp. 1321 (E.D.Pa.1978).

■ It is apparent that the procedure followed here by Agent Reuschlein was proper and that no suggestive statements were made. The witnesses were interviewed separately, the photographs were handed to each in a group, nothing was done that would indicate that one of the photos was of the bank robber, and no emphasis was placed on a particular picture. *See United States v. Hancock*, 558 F.2d 1300 (8th Cir.), *cert. denied* 434 U.S. 872, 98 S.Ct. 207, 54 L.Ed.2d 157 (1977); *United States v. Medico*, 557 F.2d 309 (2d Cir.), *cert. denied* 434 U.S. 986, 98 S.Ct. 615, 54 L.Ed.2d 481 (1977); *United States v. Ochoa*, 543 F.2d 564 (5th Cir. 1976). The individuals used in the photos were all of the same general height, weight and general appearance, as described by the eyewitnesses. Although one of the witnesses eliminated some of the photographs on the basis that they were "too heavy", we note that there was no great disparity in weight and build. For these reasons, the motion to suppress the eyewitness testimony is denied.

An appropriate Order will be entered.