UNITED STATES of America,
Plaintiff-Appellee,

v.

Archie BURTON and Andrew Ryder,
Defendants-Appellants.

Nos. 82–2711, 82–2748.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 12, 1983.

Decided Jan. 6, 1984.

As Corrected Jan. 12, 1984.

Patrick A. Tuite, The Law Office of Patrick A. Tuite, Ltd., Thomas Peters, Murphy, Peters, Davis & O'Brien, Chicago, Ill., for defendants-appellants.

Julian Solotorovsky, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before PELL and COFFEY, Circuit Judges, and NEAHER, Senior District Judge.[*]

PELL, Circuit Judge.

The defendants, Burton and Ryder, appeal their convictions by jury trial of conspiracy to commit mail and wire fraud and to travel interstate to commit arson, 18 U.S.C. §§ 371 and 1952(a)(3), and of mail fraud and wire fraud. 18 U.S.C. §§ 1341 and 1343. The defendants appeal the denial of a number of motions made before and during the joint trial.

■ First, Burton moved to sever his case from that of Ryder, his co-defendant. Second, Ryder moved to suppress taped conversations on the ground that the taping violated his Fifth Amendment right against compelled self-incrimination. Finally, both defendants objected unsuccessfully to the modified missing witness instruction given by the court below and to the related rebuttal argument of the prosecutor. The defendants reassert the same claims on appeal. The essential facts are not in controversy. To the extent that there is disagreement as to the subsidiary facts, we must view the evidence in the light most favorable to the Government, the prevailing party below. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

## I. THE FACTS

Burton owned a large power boat. He stored the boat in a Racine, Wisconsin marina every winter. By the spring of 1980, he owed the marina $4,000 for storage fees and related services. Faced with growing financial difficulties, Burton decided to sell the boat. The escalation in fuel costs, however, had severely depressed the market for large power boats. Despite the fact that he had invested nearly $50,000 in the boat, which was also the amount of insurance coverage he had, the only offer he secured was for $22,500.

Burton made contact with Kinnie, who was then a paramedic in Chicago. Kinnie,

in turn, got in touch with Ryder, a captain in the Chicago Fire Department. The three men met. Burton told them that, because he needed money, he wanted them to burn his boat, for which they would receive $2,500. The three men developed, and subsequently executed, a detailed plan to assure rapid processing of the insurance claim. A few days later, Burton and Kinnie went to the marina in Racine. Burton told the owner of the marina that there was a potential buyer for the boat and asked the owner to allow Kinnie access to the boat to prepare it for sale.

The fire occurred during the evening of May 29, 1980. That morning, Kinnie and Burton had met and discussed the details with a mutual acquaintance, Reginal Williams. Kinnie then drove Williams' car to Racine, where he worked on the boat until approximately 4:45 p.m. That evening, a time-delayed fire was started. The fire was to begin late that night, but due to a malfunction in the device, it began around 9:00 p.m. when there were still bystanders near the marina. The bystanders summoned firefighters. Consequently, the fire failed to destroy the boat completely. The next day Burton submitted an insurance claim.

Suspicion soon centered around the man whom witnesses had seen working on the boat that afternoon. Nobody except Kinnie had seen Ryder there. An investigator for the Racine Fire Department phoned Burton at about 1:00 a.m. on May 30, 1980, to inform him of the fire. Burton told the investigator that Kinnie had worked on the boat. Burton and Williams then drove to inspect the damage. Several days later, Burton, Ryder, and Kinnie met to discuss the consequences of the fire. Throughout the 1980 summer, Burton continued to press the insurance company for the settlement of his claim.

The Racine investigator called the Chicago Fire Department for information about Kinnie and Burton. Ryder, then in the

---

[*] Edward R. Neaher, Senior District Judge for the Eastern District of New York, is sitting by designation.

Internal Affairs Division, managed to get himself assigned to the investigation. It is a reasonable inference from the evidence that he thereafter attempted to impede the Racine authorities' investigation by not responding to inquiries.

In February, 1981, Chicago police arrested Kinnie on unrelated charges. Kinnie then gave a statement to the FBI in which he admitted his own involvement in the arson and implicated Ryder and Burton. In response to a grand jury subpoena, Ryder appeared on June 4, 1981, at the FBI office in Chicago, where the Government took fingerprints, handwriting exemplars, and photographs. At that time, the FBI asked Ryder if he wished to make a statement. Ryder, whose counsel appeared with him, declined and invoked his Fifth Amendment right to remain silent.

By July of 1981, Kinnie had agreed to cooperate with the Government. On three occasions between July and September, 1981, Kinnie wore a concealed recording device supplied by the FBI with the prosecutor's approval. The purpose of the surveillance was to record statements Ryder might make about the arson. Ryder made no mention of the Racine incident during the first two meetings. At the third meeting between Ryder and Kinnie, however, Ryder made a number of incriminating references to the boat-burning. In March, 1982, the federal grand jury returned a six-count indictment against Burton, Ryder, and Kinnie.

The day before the trial of the three defendants, Kinnie agreed to plead guilty to two counts of the indictment. In exchange for his testimony, the prosecution agreed to make no sentencing recommendation with respect to his conviction.

## II. MOTION TO SEVER

Counsel for Burton made a pretrial motion to sever his case from that of his co-defendants. Counsel did not allege that the cases were improperly joined. Rather, he asserted that admission of the tapes made from the conversations between Ryder and Kinnie would deprive Burton of a fair trial. The portion of the taped conversations admitted at trial included only one reference to Burton. Ryder stated: "I guess Archie didn't say anything. See Archie won't even admit that he, that he knows me." The court denied the motion at the end of the trial without stating its reasons.

█ Burton does not rely on Rule 8 of the Federal Rules of Criminal Procedure, that there was an improper joinder of the charges against him with the charges against Ryder. Indeed, while improper joinder requires mandatory severance, *United States v. Spector,* 326 F.2d 345 (7th Cir.1963), if a defendant fails to present a motion to sever explicitly based on misjoinder, he cannot raise the misjoinder issue on appeal. *United States v. Hedman,* 630 F.2d 1184, 1200 (7th Cir.1980), *cert. denied,* 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981). Nothing in the record suggests that the joinder here was improper. We will treat the motion as one coming under Rule 14 of the Federal Rules of Criminal Procedure, Burton's claim being that the use of the tape in a trial in which he was a party would be unduly prejudicial to him, the evidence assertedly being inadmissible as to him.

█ The decision whether to grant a defendant's motion for severance in a multiple-defendant trial rests in the discretion of the trial judge. A reviewing court will not set aside the trial judge's decision absent a showing of a clear abuse of discretion. *Opper v. United States,* 348 U.S. 84, 94–95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954); *United States v. Papia,* 560 F.2d 827, 840 (7th Cir.1977). To determine whether a joint trial is consistent with a defendant's right to a fair trial, we must consider whether the jury would be able to keep separate any evidence relevant to less than all the defendants. *United States v. Kahn,* 381 F.2d 824, 839 (7th Cir.1967), *cert. denied,* 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661. As we have noted previously: "There is, moreover, a strong policy in favor of joint trial 'where the charges against all the

defendants may be proved by the same evidence and results from the same series of acts.'" *United States v. McPartlin,* 595 F.2d 1321, 1333 (7th Cir.1979) (quoting *United States v. Cohen,* 124 F.2d 164, 165 (2d Cir.1942), *cert. denied,* 315 U.S. 811, 62 S.Ct. 796, 86 L.Ed. 1210), *cert. denied,* 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43.

■ Burton argues that there was no evidence that the conspiracy continued through the time of the recordings. If so, the conversation would not be admissible against Burton although admissible against Ryder. On the other hand, if the conspiracy was a continuing one, the conversation of Ryder, a co-conspirator, would be admissible against Burton. Here, the purpose of the conspiracy was to collect for Burton the proceeds of the insurance money. One aspect of the continuance arose from the fact that the money could not be collected if investigation demonstrated an arson attributable to Burton. Ryder's impeding that investigation served to hedge against that development. Primarily, of course, as long as Burton's claim continued, and it was never satisfied or withdrawn, the conspiracy continued, in law, to exist.

This court has recently addressed a similar issue in *United States v. Xheka,* 704 F.2d 974 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983). The Xheka brothers arranged to have their restaurant destroyed by a man named Howard. Six months after the fire, the Xhekas sued their insurance company for $800,000, but had not collected before their criminal case went to trial. The Government introduced a tape of a conversation between Howard and a subsequently acquitted co-defendant of the Xhekas. The conversation occurred three years after the fire. In that conversation, Howard, who was cooperating with the Government, elicited information incriminating to the Xhekas. The brothers cited, as does Burton here, two cases in support of their argument that any conspiracy that they had entered ended prior to the taped conversation. *Grunewald v. United States,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957);

*Krulewitch v. United States,* 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949).

In affirming the Xhekas' convictions, this court noted the crucial distinguishing characteristic present in arson crimes that separates arson conspiracies from other conspiracies: "The goal of obtaining money from the insurance company, which requires that the true nature of the fire remain concealed, distinguishes this case from those relied upon by defendants." *United States v. Xheka,* 704 F.2d at 985–86. Similarly, in the present case, the goal of the conspiracy was to obtain money from an insurance company.

There was sufficient evidence to show that Burton and Ryder were co-conspirators. Burton could only avoid having the remarks of his co-conspirator being used against him by withdrawing from the conspiracy before the conversation in question took place. While it was once held otherwise by this circuit, *United States v. Read,* 658 F.2d 1225, 1236 (7th Cir.1981), settled that a negation of a withdrawal must be proved by the prosecution beyond a reasonable doubt. Nevertheless, *Read* also stands for the proposition applicable here that a defendant claiming withdrawal has the burden of going forward with evidence of withdrawal. *Id.* at 1236. Burton adduced no proof in this respect and the Government's proof of the continuing conspiracy being the effort to secure the insurance money was not negated. It is of no consequence that Kinnie may have lost his status as a co-conspirator by agreeing to have his conversation taped for the statement of Ryder was the only one mentioning Burton.

"The moving party must show that he will be unable to obtain a fair trial without severance . . . ." *United States v. Allstate Mortgage Co.,* 507 F.2d 492, 495 (7th Cir. 1974), *cert. denied,* 421 U.S. 999, 95 S.Ct. 2396, 44 L.Ed.2d 666 (1975). Since Burton failed to demonstrate that any of the evidence admissible against Ryder was inadmissible against himself, the trial court's denial of the motion to sever was not an abuse of discretion. The tape was properly admitted against Burton.

## III. MOTION TO SUPPRESS

Ryder moved to suppress the statements that he made to Kinnie in July and September of 1981. He asserts that the Government violated his constitutional right to remain silent, after he had invoked the Fifth Amendment, by sending Kinnie out to record any incriminating statements that he might make. Initially, Ryder concedes, as he must, that the Sixth Amendment right to counsel is inapplicable to his claim. The Supreme Court has held unequivocally that a criminal defendant's right to counsel does not attach until the Government brings charges against the defendant. *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). Ryder also concedes that *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), precludes any possible Fourth Amendment claims from arising out of his conversations with Kinnie.

■ Once a defendant invokes the right to remain silent, Ryder does assert, then neither the Government nor an informant acting on the Government's behalf can obtain incriminating statements, absent a subsequent waiver of the right. The right to remain silent is the principal component of the Fifth Amendment privilege against compelled self-incrimination. Yet, there must be some element of compulsion before a court will find a Fifth Amendment violation. *Hoffa v. United States,* 385 U.S. at 304, 87 S.Ct. at 414. As this court has previously recognized: "Where there is no governmental authority present, there can be no compulsion which the *Miranda* rules were structured to shield against." *United States v. Gardner,* 516 F.2d 334, 339 (7th Cir.1975), *cert. denied,* 423 U.S. 861, 96 S.Ct. 118, 46 L.Ed.2d 89. *See also United States v. Bastone,* 526 F.2d 971, 977–78 (7th Cir. 1976), *cert. denied,* 425 U.S. 973, 96 S.Ct. 2172, 48 L.Ed.2d 797.

In the *Gardner* case, undercover FBI agents went to the bank where the defendant worked after he became the target of their investigation. They then recovered stolen certificates from the defendant. We rejected the defendant's Fifth Amendment claim and held *Miranda* to be inapplicable: Because the agents were undercover, the defendant was not "confronted with governmental authority of which he was aware, and consequently there could be no inherent compulsion." *Gardner,* 516 F.2d at 339. *See also Garner v. United States,* 424 U.S. 648, 656, 96 S.Ct. 1178, 1183, 47 L.Ed.2d 370 (1976); *United States v. Hansen,* 701 F.2d 1215, 1220 (7th Cir.1983).

■ The fact that a cooperating co-defendant allows himself to be a conduit of information to the FBI, whether by tape recordings, wiretapping, or merely reporting conversations, does not transform a voluntary conversation into a custodial interrogation. Here there was not the situation sometimes found in tax cases in which agents of the Government affirmatively misrepresent the status of an investigation as civil when in fact it is criminal, in which case the courts have suggested that suppression might be appropriate. *See, e.g., United States v. Nuth,* 605 F.2d 229, 234 (6th Cir.1979). Here Ryder mistakenly assumed that Kinnie was still with him on the conspiracy. The Constitution does not protect criminal defendants from their own mistaken assumption that their peers still desire to continue their criminal activities. *See Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374. Indeed, a judicially construed constitutional proscription against the type of investigative techniques employed here would render impermissible a wide variety of constitutionally acceptable approaches to criminal investigation. "[I]n the detection of many types of crime, the Government is entitled to use decoys and to conceal the identity of its agents." *Lewis v. United States,* 385 U.S. 206, 209, 87 S.Ct. 424, 426, 17 L.Ed.2d 312 (1966).

The leading case of this court in this area is *United States v. Craig,* 573 F.2d 455 (7th Cir.1977), *cert. denied,* 439 U.S. 820, 99 S.Ct. 82, 58 L.Ed.2d 110 (1978). A cooperating co-defendant allowed the Government to tap his phone in an effort to obtain incriminating statements from one of the defendants who, the Government knew, had retained counsel. The defendant claimed that

the recordings of his phone conversations violated his Fifth Amendment rights as he had received no warnings prior to making any statement. We affirmed the conviction. The recordings "involved no confrontation with governmental authority in the context of a custodial interrogation calling for *Miranda* warnings." *Id.* at 474. Therefore, the recordings did not violate his Fifth Amendment rights.

The Third Circuit has recently addressed a claim similar to the one asserted by Ryder. In *United States v. Mitlo,* 714 F.2d 294 (3d Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 550, 78 L.Ed.2d 724 (1983), the trial court suppressed incriminating statements made by the defendant which led to his arrest for Medicaid fraud. The Government knew that the defendant had retained counsel due to the investigation of his activities and that he had also invoked his Fifth Amendment rights. Nonetheless, the Government wired for sound one of the defendant's patients. Out of these taped conversations came the incriminating statements. The Government did not indict the defendant for nearly two years after the tape recordings. The Third Circuit reversed the suppression of the tapes, holding that without custodial interrogation, there can be no Fifth Amendment violation.

We find the reasoning in *Mitlo* to be persuasive and consistent with our own decisions in *Gardner* and *Craig.* The case presented here is factually indistinguishable, in all crucial respects, from *Mitlo.* In both cases, the federal authorities enlisted the aid of an informant to conduct surveillance of a criminal suspect who had retained counsel and had invoked the Fifth Amendment, but who was not yet under indictment. That the informant here was originally a co-defendant, whereas in *Mitlo* the informant had no criminal involvement, has no constitutional relevance.

Although the lack of custodial interrogation would seem to dispose of Ryder's Fifth Amendment claim, nevertheless, he argues that because Kinnie interrogated him while acting on behalf of the Government, there was no waiver of his right to remain silent.

Kinnie, however, asked no questions and made no effort to guide the conversation. Rather, Kinnie was a mere conduit recording anything Ryder might say without eliciting those statements in any way. Although Ryder analogizes his case to *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), that case is inapplicable. Unlike the Fifth Amendment claim raised by Ryder, *Henry* was a Sixth Amendment case in which the Government placed a defendant in a cell next to a cooperating prisoner who duly reported everything Henry said. Since Henry was already under arrest, the eavesdropping occurred at a critical stage. Consequently, the governmental action violated his Sixth Amendment right to counsel.

The Supreme Court noted in *Henry* the importance of the distinction between claims brought under the Fifth Amendment and those brought under the Sixth Amendment: "[T]he Fifth Amendment has been held not to be implicated by the use of undercover Government agents before charges are filed because of the absence of the potential for compulsion." *Id.* at 272, 100 S.Ct. at 2188, *citing Hoffa v. United States,* 385 U.S. at 303–04, 87 S.Ct. at 414. In the present case, because there was no interrogation within the meaning of the Fifth Amendment, the fact that Kinnie recorded his conversation with Ryder before Ryder was indicted is of no constitutional moment. The absence of both custody and direct questioning deprives the claim of a Fifth Amendment violation of all validity. Therefore, we hold that, under these circumstances, the district court properly denied Ryder's motion to suppress.

## IV. THE "MISSING WITNESS INSTRUCTION"

Both defendants allege reversible error arising out of the combination of a jury instruction and the prosecutor's rebuttal argument. The problem centers around the absence of Reginal Williams at trial. Williams was a close friend of Burton and acquainted with Ryder. The Government subpoenaed Williams to testify concerning

conversations he had had with the defendants. Defense counsel knew of the subpoena.

The day before the trial began, when the trial judge attempted to determine how long the trial would take, defense counsel stated the intention to have an extended cross-examination of Kinnie and Williams only. The Government did not indicate at that time any difficulty with securing Williams' presence at trial.

In opening statements, the Government did not mention Williams. Both defense counsel mentioned him as someone the Government would be calling. They then proceeded to suggest what a scoundrel he was. Only at the end of the first day of testimony did the prosecutor inform the court, outside of the jury's presence, that he was unable to reach Williams.

The next day, before the jury was present, the prosecutor again informed the judge that he could not reach Williams. The Government proceeded to put on further eyewitness testimony. One witness, Jorgensen, stated that he had seen more than one person on the boat during the day of the fire. He was the first witness so to testify. He described the other man on direct, and the defense counsel recommitted him to that description on cross-examination. A second Government witness mentioned Williams by name on direct.

After the close of testimony the second day, an extensive in-chambers discussion occurred. The Government again stated that it had been unable to locate Williams. The Government then stated that it was looking into a missing witness instruction. The prosecutor reiterated that, while he had not mentioned Williams' name in his opening statement, the defense attorneys had. He argued that this created an inference that the Government backed away from calling Williams after it heard how extensively he would be impeached.

Defense counsel then suggested that it could accept an instruction to the effect that the Government was unable to locate Williams. He also suggested reasons other than the friendship with the defendants as

possible explanations for why Williams did not honor his subpoena.

The court stated that the Government was entitled to an instruction informing the jury that Williams could not be located. The court went on to state that "it seems to me that the defense at that point is certainly not entitled to argue why the Government did not call him." Defense counsel did not object to this proscription.

Subsequently, Kinnie testified on direct examination by the prosecutor that Williams was present at a meeting between Kinnie and Burton. He also stated that Williams and Burton were friends and that Burton told Kinnie to use Williams' car to go to Racine. In furtherance of the Government's attempt to obtain a missing witness instruction, the prosecutor submitted in chambers an offer of proof to establish the relationship between Williams and Burton, but the court made no ruling. Then, on cross-examination of Kinnie, counsel elicited a description of Williams. Contrary to what Jorgensen had said, Kinnie went on to testify that nobody else had been on the boat with him. Counsel then asked: "So if somebody were to say that they saw you and another black man, a thin black man about the description of Reggie Williams, that would be wrong?" Kinnie responded: "Right."

On the next day although noting that the Seventh Circuit Committee on Jury Instructions had indicated in a comment that ordinarily a missing witness instruction should not be given, the trial judge stated he would give the Government's tendered modified missing witness instruction. The judge added:

I do think that the Government is entitled to, in argument, to draw an inference respecting Mr. Burton because of the evidence, one, that [Williams] was closely ... involved with Mr. Burton ... and the circumstances of his not being available, that it is a permissible inference that the Government can argue in closing arguments.

The judge indicated the instruction would be as follows:

> One of the witnesses subpoenaed by the government was Reggie Williams, who was a witness to some of the events in this case. Mr. Williams, however, while under subpoena and aware of the trial in this case, has left his residence and efforts made by the government to locate him have been unsuccessful.

Defense counsel did not object at that time, nor did the court repeat its earlier admonition that counsel were not to argue any possible alternative explanations for Williams' failure to appear. Counsel did suggest that, since there were alternative explanations, "the instruction if given should include the sentence that his absence should not be taken as evidence for or against any of the parties in the case." The judge did not so modify the instruction.

Closing arguments took place. The Government did not mention Williams specifically in its initial closing. Before defense counsel gave their closing arguments, there was an instruction conference. The court noted on the record that both defendants objected to the missing witness instruction. Additionally, defense counsel again asserted that, if the court gave the instruction, it should also instruct that the jury should not construe Williams' absence as evidence against any party.

Apparently confining themselves to the earlier directive of the judge, neither defense counsel argued as to why Williams did not appear. Counsel for Burton argued first. He only mentioned Williams in one limited respect. He noted the discrepancy between the testimonies of Jorgensen and Kinnie with respect to Kinnie's insistence that nobody else was on the boat with him. He then suggested that Jorgensen's description of the second man on the boat fit Williams. He concluded that Kinnie had lied when he testified as to the absence of anyone else, thus drawing the inference that Kinnie lied throughout his entire testimony. Counsel for Ryder highlighted the same inconsistency and raised the same inference that Kinnie was a liar. Each of the

defense counsel having abided by the court's restriction on the scope of closing argument, it appears to us that the Government is incorrect in saying that its closing argument was invited under the open-door theory.

In his subsequent argument the prosecutor noted that Williams had been present at the last pre-fire meeting between Burton and Kinnie. He continued: "Now, if Fred Kinnie was lying, why would he say that a friend of Archie Burton's, and Archie Burton told you then that Reggie Williams was a longtime friend, why would he say that a friend of Archie Burton's was present for this meeting?" We note at this point that Burton did not testify but the Government avers this was merely a slip of the tongue and that the reference obviously was to Fred Kinnie. The prosecutor then told the jury that Williams was unavailable, even though he was under subpoena. He then noted the friendship between Burton and Williams and drew the inference that Williams would have appeared if he were prepared to testify on behalf of the defendants. The defense counsel objected to this line of questioning, but the judge overruled the objection.

After closing argument, both defendants moved for a mistrial based on the closing arguments, particularly the inference drawn by the prosecutor on the reason for Williams' nonappearance. They complained that the prosecution had suggested to the jury that Burton was responsible for Williams' absence. The court denied the motion.

Defense counsel claim on appeal that the challenged instruction assumed facts not in evidence in that it states that Williams *was* a witness to certain events, which also implies that these events took place. Counsel conclude that the implication from the instruction that the events took place bolsters . Kinnie's testimony about those events, thus improperly adding credence to the rest of Kinnie's testimony.

■ The claim of error fails for a number of reasons. First, counsel failed to object to

the instruction on this ground at trial. The basis for the objection at trial was not as to what the instruction included; instead, defendants stated that the instruction would be acceptable if it included some additional language to the effect that the jury should not draw any inference adverse to either side from Williams' absence. Thus the failure to object on the ground now advanced waives the issue on appeal.

■ Additionally, however, when the jury charge is read in its entirety, any impropriety arising from the assumption of facts not proven is minimized to the point of having no possible effect. The trial court repeatedly instructed the jury that the Government had the burden of proving each element of the crimes charged beyond a reasonable doubt. Furthermore, the judge instructed that the jury should disregard any statements not supported by the evidence and that the jury was the sole finder of the facts. In light of the entire charge, the claim of counsel is not plain error requiring reversal.

In any event, in oral arguments, the defendants conceded that their complaint was not with the instruction itself, but only with its coupling with the rebuttal argument. The trial court stated that it did not consider the instruction to be a missing witness instruction "as such," and the parties appear to have agreed. As we have noted above, the defendants stated that they had no objection to the instruction if it had included a cautionary sentence that the jury was not to draw any inference from the failure of Williams to appear. We agree that the instruction is not a missing witness instruction. A typical missing witness instruction raises an inference. This instruction did not raise an inference. Viewed in isolation, it was not erroneous. Nor do we regard the instruction as erroneous because it did not include the language requested by the defendants inasmuch as the instruction given raised no adverse inference against either party. We turn therefore to the contention that the court's ruling, which allowed the Government but not the de-

fendants to argue the adverse inference, was reversible error.

■ As this court has recognized, there is a distinction between what is permissible in an instruction, "which has the weight of law," and what is permissible in argument, "which is only that." *United States v. Mahone,* 537 F.2d 922, 927–28 (7th Cir.1976) (quoting *United States v. Young,* 463 F.2d 934, 943 (D.C.Cir.1972)), *cert. denied,* 429 U.S. 1025, 97 S.Ct. 646, 50 L.Ed.2d 627. *Accord, United States v. Greschner,* 647 F.2d 740, 743 n. 6 (7th Cir.1981). Allowing the Government to comment on Williams' absence was a legitimate exercise of the trial court's discretion.

The Fifth Circuit faced a factually analogous issue in *United States v. Lehmann,* 613 F.2d 130 (5th Cir.1980). The only significant factual distinction is that the Government subpoenaed the witness in question in the present case, and there was no subpoena in *Lehmann.* Because Williams was found to be peculiarly available to the defendants, the fact that the Government had subpoenaed him is irrelevant to the analysis of this issue. Lehmann appealed on the ground, among others, that the prosecutor's closing remarks were improper. The prosecutor had questioned the failure of a missing witness to appear. Yet, the defendant had been the first person at trial to mention the missing witness, which he did in his own direct testimony. The appellate court found that the witness was more available to the defendant than to the Government. Since the defendant made no effort to produce the witness at trial, the court concluded that there was no prosecutorial error. *Id.* at 136.

Similarly, the court below found, and we do not disturb the finding, that Williams was more readily available to the defendants than to the prosecution. Furthermore, defense counsel were the first to mention Williams, during their opening statement. Additionally, there is no indication in the record that the defendants ever made any attempt to produce Williams at trial. Therefore, the ruling of the trial court al-

lowing the Government to comment on Williams' absence was proper.

On the other hand, we have some difficulty in seeing any basis for the trial court's ruling that the defendants could not argue any alternative reasons to explain why Williams failed to appear. Ordinarily, if a trial judge follows the recommendations in *Gass v. United States,* 416 F.2d 767, 775–76 (D.C.Cir.1969), to give an instruction defining for the jury the conditions that would properly result in an adverse inference, it might be proper to confine argument over an adverse inference to the party raising the inference; otherwise, the risk is great that the arguments will focus upon issues upon which there is no evidence before the jury.

In the present case, however, the trial judge provided no direct guidance to the jury as to when it might properly draw an inference adverse to the defendants from the failure of Williams to appear. The better approach to the missing witness issue is to provide such an instruction. Without any instruction, the trial judge should ordinarily allow the party against whom the adverse inference is drawn to argue that the inference is inappropriate. Otherwise, the jury might give undue emphasis to the importance of the missing witness.

Because the trial court should not have precluded defense counsel from commenting on Williams' absence, we must then determine whether that error resulted in sufficient prejudice to the defendants' case to require reversal. Harmless error analysis is readily applicable to the missing witness issue. *See, e.g., United States v. Mahone,* 537 F.2d at 928; *United States v. Hager,* 461 F.2d 321, 324 (7th Cir.1972); *Yumich v. Cotter,* 452 F.2d 59, 64 (7th Cir. 1971), *cert. denied,* 410 U.S. 908, 93 S.Ct. 955, 35 L.Ed.2d 269 (1973).

The instruction raised no inferences when viewed in isolation. The only matter potentially affected by the prosecutor's rebuttal argument was the credibility of Kinnie. The implication of the argument was that if Williams had testified, he would have supported Kinnie's testimony with respect to certain meetings of the co-conspirators. By allowing only the prosecution to argue inferences from the absence of Williams, the trial judge allowed the jury to receive a somewhat skewed view of Kinnie's credibility. Yet, the defense counsel vigorously attacked Kinnie's credibility on a number of other grounds, the principal ones being the conditions under which Kinnie had agreed to plead guilty and the inconsistency between the testimonies of Kinnie and Jorgensen. There were substantial reasons for the jury to have discredited Kinnie's testimony. Ultimately, witness credibility is a matter left for the jury to determine and it made that determination here.

It is difficult to see how the suggestion that Williams had not appeared for reasons other than his friendship with the defendants would lead the jury to conclude that Kinnie was a perjurer if the jury was not inclined to reach that conclusion from the impeaching material actually before it. Furthermore, even if the defense had argued the alternative inferences and convinced the jury thereby that Kinnie had given false testimony, there was still overwhelming evidence introduced against the defendants at trial. *Cf. United States v. Mahone,* 537 F.2d at 928. The Government was prepared to proceed to trial without Kinnie's testimony. Kinnie agreed to plead guilty the night before the trial began. There was independent testimony about the activities on the boat in the days preceding the fire. The Racine arson investigator testified as to Ryder's uncooperative actions during the investigation arising out of the fire. An FBI agent testified that Burton had altered a check, which resulted in an initially inflated insurance claim. Insurance company employees also testified as to Burton's repeated attempts to recover the insurance proceeds. Finally, perhaps the most damning evidence, in addition to Kinnie's testimony, was the tape of the Kinnie-Ryder conversation, a transcript of which was before the jury. Viewing the evidence in its entirety, we see no reasonable possibility that the verdict could have resulted simply because of the prosecutor's specula-

tion as to Williams' corroboration of Kinnie's testimony.

 Finally, the instructions given by the trial court were sufficient to overcome any prejudice arising from the court's failure to allow the defendants to argue any alternative inferences. Other instructions can prevent prejudice from arising out of a trial judge's failure to issue proper instructions concerning a missing witness. *See, e.g., United States v. Dyba,* 554 F.2d 417, 422 (10th Cir.1977), *cert. denied,* 434 U.S. 830, 98 S.Ct. 111, 54 L.Ed.2d 89; *United States v. Hersh,* 464 F.2d 228, 232 (9th Cir.1972) (per curiam), *cert. denied,* 409 U.S. 1008, 93 S.Ct. 442, 34 L.Ed.2d 301.

The trial judge gave several instructions that, viewed as a whole, negate the potential prejudice in the inability of the defense to suggest other reasons for the absence of Williams. Among these instructions were the following: that the jury is the sole judge of credibility; that the judge does not "mean to indicate any opinion as to the facts" by his instructions; that statements of counsel should be disregarded to the extent that they are not supported by the evidence; that the jury should consider only the evidence received at trial; that the jury should presume the defendants to be innocent; that the burden is on the Government to prove the defendants' guilt beyond a reasonable doubt; and, that the defendants are not required to prove their innocence or to produce any evidence. These instructions more than compensate for the failure of the trial judge to allow defense counsel to argue alternative inferences.

We have considered all of the other contentions raised by the defendants and find them to be without merit. Accordingly, the judgments of conviction of the defendants are AFFIRMED.